Opinion by Judge MILAN D. SMITH, JR.; Dissent by Judge WILLIAM A. FLETCHER.
OPINION
M. SMITH, Circuit Judge:
Plaintiffs-Appellants Elizabeth Aida Haskell, Reginald Ento, Jeffrey Patrick Lyons, Jr., and Aakash Desai (collectively, Plaintiffs) appeal the district court’s denial of their motion for a preliminary injunction to stop the enforcement of the 2004 Amendment, infra, to California’s DNA and Forensic Identification Data Base and Data Bank Act of 1998 (DNA Act), Cal.Penal Code § 296(a)(2)(C), which amendment requires law enforcement officers to collect DNA samples from all adults arrested for felonies. They contend that the 2004 Amendment violates their Fourth Amendment right to be free of unreasonable searches and seizures.
We assess the constitutionality of the 2004 Amendment by considering the “totality of the circumstances,” balancing the arrestees’ privacy interests against the Government’s need for the DNA samples. Law enforcement officials collect a DNA sample from a buccal swab of the arrestee’s mouth, a de minimis intrusion that occurs only after a law enforcement officer determines there is probable cause to believe that the individual committed a felony. Law enforcement officers analyze only enough DNA information to identify the individual, making DNA collection substantially similar to fingerprinting, which law enforcement officials have used for decades to identify arrestees, without serious constitutional objection. Moreover, state and federal statutes impose significant criminal and civil penalties on persons who misuse DNA information. On the *1051 other side of the balance, DNA analysis is an extraordinarily effective tool for law enforcement officials to identify arrestees, solve past crimes, and exonerate innocent suspects. After weighing these factors, we conclude that the Government’s compelling interests far outweigh arrestees’ privacy concerns. Thus, we hold that the 2004 Amendment does not violate the Fourth Amendment, and we affirm.
BACKGROUND
In 1998, the California legislature enacted the DNA Act, Cal. Stat. Ch. 696, § 2, which requires DNA testing of individuals convicted of certain offenses. The DNA Act is intended to aid local, state, and federal law enforcement agencies “in the expeditious and accurate detection and prosecution of individuals responsible for sex offenses and other crimes, the exclusion of suspects who are being investigated for these crimes, and the identification of missing and unidentified persons, particularly abducted children.” CaLPenal Code § 295(c).
Law enforcement use of California’s DNA database has proven remarkably effective. Since 1998, California law enforcement officials have identified more than 10,000 offenders by using their DNA. To build on the positive results achieved through the implementation of the DNA Act, in 2004, California voters approved Proposition 69, the DNA Fingerprint, Unsolved Crime and Innocence Protection Act (the 2004 Amendment), which expanded the DNA Act’s testing requirement to include “any adult person arrested or charged with any felony offense ... immediately following arrest, or during the booking ... process or as soon as administratively practicable after arrest, but, in any ease, prior to release on bail or pending trial or any physical release from confinement or custody.” CaLPenal Code §§ 296(a)(2)(C); 296.1(a)(1)(A). Proposition 69 cited the “critical and urgent need to provide law enforcement officers and agencies with the latest scientific technology available for accurately and expeditiously identifying, apprehending, arresting, and convicting criminal offenders and exonerating persons wrongly suspected or accused of crime.”
The 2004 Amendment became effective on January 1, 2009. Officers usually collect the DNA sample from a buccal swab that is gently swept along an arrestee’s inner cheek. An arrestee’s failure to cooperate with the collection is a misdemeanor. CaLPenal Code § 298.1(a).
Once officers collect the DNA sample, it is sent to a State laboratory, which creates a DNA profile of the arrestee. The laboratory creates a profile only for identification purposes by analyzing thirteen genetic markers known as “junk DNA,” which are not linked to any known genetic traits. The laboratory uses “short tandem repeat” technology (STR), which is the repeated sequence of base pairs at each of the thirteen markers. The variation in the number of sequences at each marker creates a unique profile that law enforcement uses for identification. “One person might have two copies of the first marker that are four and eight repeats long, copies of the second that are eleven and twenty-three copies long, copies of the third that are three and ten copies long, and so on through all thirteen markers.” United States v. Mitchell, 652 F.3d 387, 401 (3d Cir.2011) (en banc) (quoting Henry T. Greely et al., Family Ties: The Use of DNA Offender Databases to Catch Offenders’ Kin, 34 J.L. Med. & Ethics 248, 250 (2006)). The odds that two people share identical sequences on all thirteen markers are “one in several hundred billion.” Id.
The State laboratory then uploads the DNA profile into the Combined DNA Index System (CODIS), a nationwide collection of federal, state, and local DNA pro *1052 files. “Beyond the STR-generated DNA profile, CODIS records contain only an identifier for the agency that provided the DNA sample, a specimen identification number, and the name of the personnel associated with the analysis.” United States v. Kincade, 379 F.3d 813, 819 n. 8 (9th Cir.2004) (en banc) (citing H.R.Rep. No. 106-900(1), at *27 (2000)).
When an arrestee’s DNA profile is uploaded into CODIS, it is compared to the DNA samples collected from crime scenes. If the database reveals a “hit,” the offender DNA sample is tested again for confirmation. If the test confirms a match, CO-DIS informs the laboratory that submitted the crime scene sample of the identity of the matching DNA profile, and the laboratory sends that information to law enforcement.
Only law enforcement officials are permitted to access a DNA profile, and they may only use the DNA to identify criminal suspects. CaLPenal Code §§ 295.1(a); 299.5(f). They may not use the sample to reveal other traits, such as medical conditions. Unauthorized access or disclosure of DNA information is punishable under State law by up to a year in prison and a fine of up to $50,000. CaLPenal Code § 299.5(i). Federal law imposes similar penalties for unauthorized use of, or access to, CODIS. See 42 U.S.C. § 14133(c), 14135e(e).
An arrestee who is not ultimately convicted may ask either the California Department of Justice or the trial court to order the sample destroyed and the DNA profile expunged. CaLPenal Code § 299. The individual must await the expiration of the statute of limitations for the crime(s) for which he or she was charged before requesting expungement, unless prosecutors dismiss the charges sooner. The court may order the expungement 180 days after the arrestee’s request. Id.
After the police determined that probable cause existed in each case, Plaintiffs were arrested for felonies in California and provided DNA samples. However, they were never convicted of the felonies for which they were charged. On October 7, 2009, Plaintiffs filed a class-action complaint against the State officials who administer the DNA collection system. The class consists of “persons who are required to provide a DNA sample pursuant to § 296(a)(2)(C) solely as a result of being arrested for a felony.” Their lawsuit, filed under 42 U.S.C. § 1983, alleges that the 2004 Amendment violates their Fourth Amendment rights to be free from unreasonable searches and seizures, and their Fourteenth Amendment due process rights.[1] They then sought a preliminary injunction to enjoin California from collecting DNA samples from people who were arrested, but not convicted.
The district court provisionally certified the class. On December 23, 2009, the district court denied the preliminary injunction, concluding that, as a matter of law, Plaintiffs had not demonstrated a likelihood of success on the merits because California’s DNA collection requirement does not violate the Fourth Amendment. The district court also concluded that Plaintiffs did not allege irreparable harm, the balance of equities tipped in favor of the State, and injunctive relief likely would not be in the public interest. Plaintiffs timely appealed.
JURISDICTION AND STANDARD OF REVIEW
We have jurisdiction under 28 U.S.C. § 1292(a)(1). We review the district *1053 court’s factual determinations for clear error. Klein v. City of San Clemente, 584 F.3d 1196, 1200 (9th Cir.2009). We review the district court’s application of the preliminary injunction balancing test for abuse of discretion and the legal conclusions de novo. Stormans, Inc. v. Selecky, 586 F.3d 1109, 1119 (9th Cir.2009). “To determine whether the district court abused its discretion, the reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.” DISH Network Corp. v. FCC, 653 F.3d 771, 776 (9th Cir.2011) (citation and internal quotation marks omitted).
DISCUSSION
A federal court may grant a preliminary injunction only if the plaintiff establishes four elements: (1) likelihood of success on the merits; (2) likelihood of suffering irreparable harm absent a preliminary injunction; (3) the balance of equities tips in the plaintiffs favor; and (4) injunctive relief is in the public interest. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). If we agree with the district court’s conclusion that Plaintiffs have not satisfied their burden of establishing the first element, “we need not consider the remaining three.” DISH Network Corp., 653 F.3d at 777; see also Advertise.com, Inc. v. AOL Adver., Inc., 616 F.3d 974, 982 (9th Cir.2010); Doe v. Reed, 586 F.3d 671, 681 n. 14 (9th Cir.2009), aff'd — U.S. -, 130 S.Ct. 2811, 177 L.Ed.2d 493 (2010).
The likelihood of Plaintiffs’ success on the merits hinges on whether California’s mandatory DNA collection requirement under the 2004 Amendment, as applied to felony arrestees who have not been convicted, violates the Fourth Amendment. Plaintiffs challenge the 2004 Amendment, California Penal Code § 296(a)(2)(C), both facially and as applied to them. To successfully mount a facial challenge, the Plaintiffs “must establish that no set of circumstances exists under which the [2004 Amendment] would be valid,” United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), while their as-applied challenge only requires a demonstration that the 2004 Amendment is unconstitutional as applied to the Plaintiffs. Thus, if we find that the 2004 Amendment is constitutional as applied to the provisionally certified class, the facial challenge also fails.
I. Analytical framework
The Fourth Amendment protects “[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.” U.S. Const, amend. IV (emphasis added).
It is undisputed that a compelled DNA extraction is a “search” for Fourth Amendment purposes. See, e.g., Kincade, 379 F.3d at 821 n. 15 (“The compulsory extraction of blood for DNA profiling unquestionably implicates the right to personal security embodied in the Fourth Amendment, and thus constitutes a ‘search’ within the meaning of the Constitution.”). The question before us is whether California’s DNA collection requirement under the 2004 Amendment is an unreasonable search. In line with the Constitution’s plain text, “[t]he touchstone of our analysis under the Fourth Amendment is always ‘the reasonableness in all the circumstances of the particular governmental invasion of a citizen’s personal security.’ ” Pennsylvania v. Mimms, 434 U.S. 106, 108-09, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (quoting Terry v. Ohio, 392 U.S. 1, 19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).
We apply the “totality of the circumstances” balancing test to determine *1054 whether a warrantless search is reasonable. See Samson v. California, 547 U.S. 843, 848, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006) (applying totality of the circumstances test to determine whether a mandatory search as a condition of parole violates the Fourth Amendment); United States v. Kriesel, 508 F.3d 941, 946-47 (9th Cir.2007) (applying totality of the circumstances test to mandatory DNA collection from convicted federal felons). Under the totality of the circumstances test, “[w]hether a search is reasonable is determined by assessing, on the one hand, the degree to which it intrudes upon an individual’s privacy, and on the other, the degree to which it is needed for the promotion of legitimate governmental interests.” Samson, 547 U.S. at 848, 126 S.Ct. 2193 (citation and internal quotation marks omitted).
Plaintiffs contend that we may only consider the totality of the circumstances if we first find that the 2004 Amendment satisfies a “special needs” exception to the Fourth Amendment. In Kriesel, we explicitly rejected the special needs test when we applied the totality of the circumstances analysis to the mandatory DNA collection requirement without first determining whether a special need existed. 508 F.3d at 946. Although Kriesel involved DNA collection from convicted felons, Plaintiffs cite no precedent that would require the “special needs” test for DNA collection from arrestees to assess the constitutionality of a search conducted for law enforcement purposes. Interestingly, the Supreme Court even applied the totality of the circumstances test to determine whether strip searches of pretrial detainees were constitutional. Bell v. Wolfish, 441 U.S. 520, 559-60, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); see also Mitchell, 652 F.3d at 403 (selecting the totality of the circumstances analysis over the special needs test to assess the constitutionality of a federal requirement that pretrial detainees provide DNA samples as a condition of release). Accordingly, we apply only the totality of the circumstances analysis to Plaintiffs’ challenge to the 2004 Amendment.
II. Past cases involving compelled DNA testing
The constitutionality of California’s requirement that all felony arrestees provide DNA samples is a question of first impression for us.[2] However, in four cases, we have applied the totality of the circumstances analysis and upheld mandatory *1055 DNA collection, from persons who have been convicted of felonies.
In Rise v. Oregon, 59 F.3d 1556 (9th Cir.1995), we upheld a state law that required certain convicted felons to provide DNA blood samples. Applying a totality of the circumstances analysis, we concluded that the statute did not violate the Fourth Amendment because of “the reduced expectations of privacy held by persons convicted of one of the felonies to which [the statute] applies, the blood extractions’ relatively minimal intrusion into these persons’ privacy interests, the public’s incontestable interest in preventing recidivism and identifying and prosecuting murderers and sexual offenders, and the likelihood that a DNA data bank will advance this interest[.]” Id. at 1562.
In Kincade, we upheld a requirement that people convicted of certain serious federal felonies provide DNA blood samples. 379 F.3d at 840. The plurality of the en banc court applied the totality of the circumstances analysis and concluded that the compelled DNA collection “can only be described as minimally invasive— both in terms of the bodily intrusion it occasions, and the information it lawfully produces.” Id. at 838. On the other side of the balancing test, the plurality concluded that the DNA collection helps ensure that a parolee complies with requirements of release, reduces recidivism, and “helps •bring closure to countless victims of crime who long have languished in the knowledge that perpetrators remain at large.” Id. at 839.
Similarly, in Kriesel, we upheld an amendment to the federal DNA collection act, which requires DNA collection from all persons convicted of federal felonies. We held that, under the totality of the circumstances, the statute is constitutional “because the government’s significant interests in identifying supervised releasees, preventing recidivism, and solving past crimes outweigh the diminished privacy interests that may be advanced by a convicted felon currently serving a term of supervised release.” 508 F.3d at 950.
Most recently, in Hamilton v. Brown, 630 F.3d 889 (9th Cir.2011), we held that California’s requirement that prison inmates must provide blood samples for DNA identification comports with the Fourth Amendment.
Rise, Kincade, Kriesel, and Hamilton involved DNA searches of people who have been convicted of felonies. We acknowledge that convicted persons have lesser privacy expectations than persons who have only been arrested for felonies. See United States v. Scott, 450 F.3d 863, 873 (9th Cir.2006) (holding that a defendant “out on his own recognizance before trial” has privacy interests “far greater than a probationer’s.”). However, the general principles outlined in these cases are instructive for our totality of the circumstances analysis.
III. Friedman v. Boucher
Before applying the totality of the circumstances analysis to the 2004 Amendment, we must address Plaintiffs’ claim that Friedman v. Boucher, 580 F.3d 847 (9th Cir.2009) requires us to find, as a matter of law, that the 2004 Amendment is unconstitutional.
In Friedman, plaintiff Kenneth Friedman pled guilty in Montana to sexual intercourse without consent, in 1980. Id. at 851. He was released from prison in 2001, at which point he was not on parole or otherwise under state supervision. Montana law required Friedman to submit a DNA sample, but he never did. In March 2003, after he had moved to Las Vegas, Friedman was incarcerated as a pre-trial detainee on unrelated charges, and, at the direction of a deputy district attorney, a police detective forced Friedman to pro *1056 vide DNA via a buccal swab. Id. No Nevada statute authorized the collection of DNA, nor were there any limits on the use of the information derived from Friedman’s DNA. Friedman sued under 42 U.S.C. § 1983, alleging a violation of his Fourth Amendment rights. The district court found that the defendants had qualified immunity and dismissed the case. Id.
We found that the Montana statute did not provide Nevada police with authority to collect Friedman’s DNA sample, nor did the search constitute a “special need” that is exempt from the Warrant Clause. Id. at 853-54. Although we did not explicitly apply the totality of the circumstances analysis, we briefly assessed the “reasonableness” of the Nevada officer’s actions and distinguished the case from Kincade and Kriesel because Friedman was not on parole or otherwise under police supervision. Id. at 857-58. Accordingly, we reversed the district court, concluding:
The warrantless, suspicion-less, forcible extraction of a DNA sample from a private citizen violates the Fourth Amendment. The actions of the officers were not justified under the ‘special needs’ exception, reliance on an extraterritorial statute, or on general Fourth Amendment principles. The search and seizure of Friedman’s DNA violated the Constitution.
Id. at 858.
Although Friedman contains very broad dicta that Plaintiffs have construed as requiring us to find that all DNA collection from felony arrestees is per se unconstitutional, its holding is expressly limited to the unique set of facts in that case. See Friedman, 580 F.3d at 851 (“Because the forcible taking of the DNA sample under these circumstances violated Friedman’s clearly established Fourth Amendment rights, we reverse.”) (emphasis added). Thus, Friedman requires us to find the 2004 Amendment unconstitutional only if we conclude that the circumstances of that case are sufficiently similar to the facts here. We conclude that Friedman differs significantly from this case for five reasons.
First, the DNA collection in Friedman was conducted at the whim of one deputy district attorney, acting without any statutory authority. Although the Las Vegas police attempted to collect the DNA under the Montana statute, we held that they were not allowed to do so because the Montana statute did not apply extraterritorially. See Friedman, 580 F.3d at 854 (“Defendants were Nevada officials searching a Nevada citizen in the state of Nevada for Nevada law enforcement purposes. They are not entitled to justify their search with a Montana statute.”) In contrast, the DNA collected in California from the Plaintiffs was approved in a statewide ballot referendum, which is “a basic instrument of democratic government.]” East-lake v. Forest City Enters., Inc., 426 U.S. 668, 679, 96 S.Ct. 2358, 49 L.Ed.2d 132 (1976); see also Southern Alameda Spanish Speaking Org. v. City of Union City, 424 F.2d 291, 294 (9th Cir.1970) (describing the referendum as “an exercise by the voters of their traditional right through direct legislation to override the views of their elected representatives as to what serves the public interest.”). Millions of California voters considered the reasonableness of collecting DNA from arrestees, in stark contrast to the search in Friedman.
Second, the police in Friedman singled out one individual for a search. In contrast, the California DNA Act is programmatic and applies to all felony arrestees. California police officers lack any discretion to choose which individuals are subject to DNA collection. Because officers in California cannot choose the subjects of DNA collection, there is far less potential *1057 for abuse or arbitrary action. “An essential purpose of a warrant requirement is to protect privacy interests by assuring citizens subject to a search or seizure that such intrusions are not the random or arbitrary acts of government agents.” Skinner v. Ry. Labor Executives’ Ass’n, 489 U.S. 602, 621-22, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). “[Standardized criteria ... or [an] established routine” can prevent a search from being “a ruse for a general rummaging in order to discover incriminating evidence.” Florida v. Wells, 495 U.S. 1, 4, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990); see also United States v. Weikert, 504 F.3d 1, 14 (1st Cir.2007) (“Courts have acknowledged that the presence of such discretion affects the balancing of interests[.]”).
Third, the detective “forced Friedman’s jaw open and forcefully took a buccal swab from the inside of Friedman’s mouth.” Friedman, 580 F.3d at 851. This use of force weighed heavily in our reasonableness analysis. Id. at 856-57. In contrast, California arrestees typically swipe the buccal swab along their own mouths; thus law enforcement officials do not usually use force. Although the 2004 Amendment allows law enforcement officials to compel the taking of DNA samples, a supervisor must first provide written approval for the use of force, and the force must “be preceded by efforts to secure the voluntary compliance with this section.” Cal.Penal Code § 298.1(c)(1)(C).
Fourth, the California DNA Act imposes criminal penalties on people who misuse DNA information, CaLPenal Code § 299.5(i); Nevada had no such safeguards because no statute authorized the DNA collection. Friedman’s DNA theoretically could have been accessed by anyone and used for any purpose, not just identification. In Rise, the restrictions on access to DNA information weighed in favor of finding the statute reasonable. 59 F.3d at 1561.
Finally, the California DNA Act is clearly intended to allow law enforcement officials to identify criminal suspects, a purpose that we expressly approved in Rise. See 59 F.3d at 1560 (“[E]veryday ‘booking’ procedures routinely require even the merely accused to provide fingerprint identification, regardless of whether investigation of the crime involves fingerprint evidence.”). It is unclear what purpose the DNA collection in Friedman was intended to serve because it was not authorized by any Nevada statute or regulation. In a recent en banc opinion upholding a federal requirement for DNA collection as a condition of pretrial release, the Third Circuit declined to follow Friedman because it “did not consider the identification purpose of DNA samples[.]” Mitchell, 652 F.3d at 413 n. 23. We agree with the Third Circuit’s reasoning on this point.
Our dissenting colleague claims that Friedman “requires us to hold that Proposition 69 violates the Fourth Amendment,” yet he glosses over the significant differences we cite between that case and this one. The search in Friedman raised far more significant Fourth Amendment concerns than does the case before us because there was no statutory authorization for the search, authorities singled out one individual, and there were no restrictions on the access to, or use of, the DNA information. Accordingly, the “reasonableness” analysis of Friedman is inapposite here, its holding does not bind us, and we proceed to apply a totality of the circumstances test to the specific facts of this case.
IY. Totality of the circumstances
In assessing the totality of the circumstances, we balance the individual’s privacy interests against the Government’s *1058 interests in prison administration and law enforcement. Samson, 547 U.S. at 848, 126 S.Ct. 2193.
A. Felony arrestees’ privacy interests
The 2004 Amendment does not provide the Government carte blanche to take buccal swabs from anyone and everyone. It applies only to persons arrested on suspicion of having committed a felony. Before individuals can be required to give a buccal swab DNA sample under the 200Jp Amendment, a law enforcement officer must determine that there is probable cause to suspect that person of having committed a felony.
Even critics of mandatory DNA sampling concede that a felony arrestee has a significantly diminished expectation of privacy. See Kincade, 379 F.3d at 864 (Reinhardt, J., dissenting) (“Arrestees’ privacy interests, too, appear to be significantly reduced.”). Upon arrest, individuals are often booked and placed in a jail cell pending arraignment or bail, and at that point they are typically subjected to numerous degrading physical and emotional intrusions. They may be subjected to visual body cavity searches, Bell, 441 U.S. at 558 & n. 39, 99 S.Ct. 1861 (upholding searches where male inmates “must lift [their] genitals and bend over to spread [their] buttocks for visual inspection” and “[t]he vaginal and anal cavities of female inmates also are visually inspected”); Bull v. City & Cnty. of San Francisco, 595 F.3d 964, 974-75 (9th Cir.2010) (en banc) (same); be monitored by guards of the opposite sex while they shower and use the toilet, Johnson v. Phelan, 69 F.3d 144, 145 (7th Cir.1995); be restrained and pepper-sprayed, Garrett v. Athens-Clarke Cnty., Ga., 378 F.3d 1274, 1278 (11th Cir.2004); have their telephone access restricted, Valdez v. Rosenbaum, 302 F.3d 1039, 1048-49 (9th Cir.2002); occasionally be housed with violent detainees who leave them “with facial injuries that require [ ] surgery,” Schoelch v. Mitchell, 625 F.3d 1041, 1043 (8th Cir.2010); and be “in lockdown for as much as 23^ hours a day, always shackled in chains, even when taking a shower or making a phone call, and rarely being allowed to see daylight and breathe fresh air.” Jeff German, Conditions at jail ‘harsh’ but court can’t change them, Las Vegas Sun (Oct. 28, 2008). The dissent suggests, without any authority for his claim, that security interests and other exigent circumstances allow these privacy intrusions, but not DNA sampling. Just as such intrusive jail-related conditions could not lawfully be imposed on ordinary citizens, neither does the 2004 Amendment impose the taking of buccal DNA swabs from ordinary citizens.[3]
We evaluate Plaintiffs’ allegations that the 2004 Amendment is unreasonable against this backdrop of diminished privacy rights. We evaluate two distinct claims of privacy intrusion: the physical collection of the DNA, and the analysis of the information contained in that sample.
1. The physical intrusiveness of the search
Nearly half a century ago, the Supreme Court upheld as “reasonable” a hospital’s extraction of a blood sample, which was done “[a]t the direction of a police officer” who was investigating a person suspected of driving under the influence. Schmerber v. California, 384 U.S. 757, 758, 771, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). See *1059 also Skinner, 489 U.S. at 616, 109 S.Ct. 1402 (“[I]t is obvious that this physical intrusion, penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reasonable.”). Like the Plaintiffs in this case, the suspect in Schmerber had not yet been convicted of a crime.
The typical modern DNA collection procedure — the buccal swab — is far less invasive than the blood test approved in Schmerber. In the buccal swab DNA sampling, a cotton swab is briefly inserted into the person’s mouth; in the typical blood extraction (such as the one addressed in Schmerber), a needle must be inserted into a blood vessel for a perceptible amount of time. The buccal swab cannot seriously be viewed as an unacceptable violation of a person’s bodily integrity.[4] See United States v. Amerson, 483 F.3d 73, 84 n. 11 (2d Cir.2007) (“[A] cheek swab can be taken in seconds without any discomfort.”); Jules Epstein, “Genetic Surveillance” — The Bogeyman Response to Familial DNA Investigations, 2009 U. Ill. J.L. Tech & Pol’y 141, 152 (2009) (“The taking of bodily material for DNA testing is perhaps the least intrusive of all seizures — it involves no penetration of the skin, pain, or substantial inconvenience.”). Moreover, California law enforcement officers typically allow arrestees to perform the buccal swab collection on themselves, further minimizing the physical privacy intrusion.
In short, the physical extraction of DNA using a buccal swab collection technique is little more than a minor inconvenience to felony arrestees, who have diminished expectations of privacy. Moreover, it is substantially less intrusive, both physically and emotionally, than many of the other types of approved intrusions that are routinely visited upon arrestees, see supra at 1057-58.
2. The Government’s use and retention of DNA information
Plaintiffs challenge not only the physical intrusion of the buccal swab, but the collection and use of the information contained in the DNA sample.
Although Plaintiffs use the phrase “DNA profile” to evoke images of an oppressive “Big Brother” cataloguing our most intimate traits, the reality is far less troubling. A DNA profile contains only thirteen “junk DNA” markers that are not linked to any genetic or physical trait. They are used only to identify the individual. See Cal.Penal Code § 295.1(a) (“The Department of Justice shall perform DNA analysis ... pursuant to this chapter only for identification purposes.”); Kincade, 379 F.3d at 837 (“[T]he DNA profile derived from the defendant’s blood sample establishes only a record of the defendant’s identity — otherwise personal information in which the qualified offender can claim no right of privacy once lawfully convicted of a qualifying offense (indeed, once lawfully arrested and booked into state custody).”); Amerson, 483 F.3d at 85 (“[A]t least in the current state of scientific knowledge, the DNA profile derived from the offender’s blood sample establishes only a record of the offender’s identity.”).
Given the minimal amount of information contained in a DNA profile, we are persuaded that DNA, as collected and used under the 2004 Amendment, is substantially indistinguishable from traditional fingerprinting as a means of identifying arrestees and, incidentally, tying arrestees *1060 to criminal investigations. See Rise, 59 F.3d at 1559 (“The information derived from the blood sample is substantially the same as that derived from fingerprinting— an identifying marker unique to the individual from whom the information is derived.”); Mitchell, 652 F.3d at 412 (“[B]e-cause DNA profiles developed pursuant to the DNA Act function as ‘genetic fingerprints’ used only for identification purposes, arrestees and pretrial detainees have reduced privacy interests in the information derived from a DNA sample.”).
Although there are some distinctions between DNA and fingerprints, these distinctions do not implicate serious privacy concerns. These differences include, among others: DNA identification is more robust and reliable than fingerprint identification, see Dist. Attorney’s Office for Third Judicial Dist. v. Osborne, 557 U.S. 52, 129 S.Ct. 2308, 2316, 174 L.Ed.2d 38 (2009) (“Modern DNA testing can provide powerful new evidence unlike anything known before.”); DNA is more often left at crime scenes than fingerprints, thus enhancing DNA’s investigative efficacy; and, as emphasized by Plaintiffs, DNA contains a much broader range of identifying information than fingerprints and is more susceptible to misuse. Nevertheless, the relative reliability and greater availability of DNA do not affect any cognizable privacy interests (as individuals do not have a “privacy interest” per se in the efficiency of law enforcement operations), and the wider potential usage of DNA data (and accompanying potential for abuse) is carefully restricted by the strict limitations established in the DNA Act.
Fingerprinting has been consistently upheld as constitutional. Hayes v. Florida, 470 U.S. 811, 813-18, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985); Napolitano v. United States, 340 F.2d 313, 314 (1st Cir.1965) (“Taking of fingerprints ... is universally standard procedure, and no violation of constitutional rights.”); United States v. Iacullo, 226 F.2d 788, 793 (7th Cir.1955) (“[Defendant’s] constitutional rights were not violated when his fingerprints were taken and at the trial used as a basis for comparison with fingerprints found on newspapers used to wrap narcotics.”); United States v. Kelly, 55 F.2d 67, 68-69 (2d Cir.1932). Indeed, at oral argument, Plaintiffs’ counsel conceded that fingerprinting does not violate the Fourth Amendment. Given the certain constitutionality of fingerprinting and the clear analogy between fingerprinting and DNA identification under the DNA Act, as amended, privacy concerns here are diminished substantially. We agree with the dissent’s concession that “fingerprints and DNA are similar.” We also generally have no quarrel with the dissent’s statement that the Supreme Court has “held that fingerprints may not be taken unless there is consent, a warrant, or probable cause.”[5]
The dissent’s key argument collapses, however, because he completely ignores the fact that the California DNA Act clearly requires that law enforcement officers may only compel DNA collection upon a finding of probable cause that the individual has committed a felony. Moreover, each of the four cases on which the dissent relies for some of his remarkable theories—Hayes; Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 *1061 (1969); United States v. Ortiz-Hernandez, 427 F.3d 567 (9th Cir.2005); and United States v. Garcia-Beltran, 389 F.3d 864 (9th Cir.2004), involved the compelled taking of fingerprints of people who had been arrested without probable cause.[6] This distinction completely undermines our dissenting colleague’s novel interpretation of the Fourth Amendment, and his reliance on the four cited cases. We agree that the California DNA Act would be unconstitutional if it allowed police officers to collect DNA samples from random citizens on the street without any probable cause to believe that they committed a crime. In reality, however, the police cannot collect DNA without first determining that there is probable cause that the individual committed a felony.
The other fatal flaw in the dissent’s novel construction of the Fourth Amendment is his entirely unsupported assumption that the information derived from compelled fingerprinting and DNA collection may only be used in connection with the crime for which probable cause was found. The dissent cites absolutely no authority for this unprecedented and misguided reading of the Fourth Amendment. Were he correct, our entire criminal justice system would be upended because law enforcement officers would be prevented from using basic investigative tools. For example, under our dissenting colleague’s theory, the police could never be allowed to match crime scene fingerprints to databases of prints collected from past arrestees.
Like the dissent, Plaintiffs rely on slippery-slope arguments by challenging not only what California actually does with the DNA samples, but what it could do with the information. Their opposition rests on hypothetical scenarios in which the Government uses the DNA sample to do more than merely identify individuals. Plaintiffs suggest that the Government could test the DNA for diseases such as cystic fibrosis and Alzheimer’s disease. This line of reasoning — framed in bleak Orwellian terms by the California Court of Appeal in Buza, 197 Cal.App.4th at 1443-44, 129 Cal.Rptr.3d 753—ignores the clear statutory limitations drawn by the Legislature, and the fact that there is no evidence in the record of a single case of DNA misuse in California. If we were addressing a legislative scheme in which the Government could freely use a person’s DNA sample in any manner and for any purpose, serious privacy interests could be at stake. But we are not presented with an open-ended legislative scheme in which citizens’ entire genomes are placed on file with the Government. The DNA Act, as amended by the 2004 Amendment, sharply limits the range of permissible uses of the DNA information obtained and imposes significant criminal penalties upon those who violate such limitations. See CaLPenal Code §§ 295.1, 299.5(f), 299.5®. See, e.g., Weikert, 504 F.3d at 13 (“[T]he [federal] DNA Act offers a substantial deterrent to such hypothetical abuse by imposing a criminal penalty for misuse of DNA samples.”).
*1062 Plaintiffs argue that California’s limits on access and use are ineffective because California data is shared with law enforcement agencies nationwide via CODIS. This argument also fails because federal law imposes similar penalties for unauthorized use of CODIS. See 42 U.S.C. § 14133(c), 14135e(c). Moreover, even if an unauthorized person were to access California’s DNA database, the only information available would be junk DNA that identifies felony arrestees. And if the junk DNA could reveal other traits, misuse of that information would likewise be barred by federal law. For example, the Genetic Information Nondiscrimination Act of 2008, Pub.L. 110-233, 122 Stat. 881, prohibits health insurers and employers from discriminating against people based on their genetic information.
While it is hypothetically possible that, at some future time, rogue Government employees may record and analyze more extensive DNA information, see Kincade, 379 F.3d at 847 (Reinhardt, J., dissenting), or that the California Legislature might expand the permissible scope and uses of the DNA data, see id. at 845-46, we cannot legitimately weigh the constitutionality of the current legal regime by arguing about hypothetical and highly speculative actions that would undeniably violate the DNA Act, as amended by the 2004 Amendment, as now in effect. “[0]ur job is limited to resolving the constitutionality of the program before us, as it is designed and as it has been implemented,” and we must “base decisions not on dramatic Hollywood fantasies ... but on concretely particularized facts developed in the cauldron of the adversary process and reduced to an accessible record.” Kincade, 379 F.3d at 838; see also Mitchell, 652 F.3d at 408 (“While we acknowledge the seriousness of [defendant’s] concerns about the possible misuse and future use of DNA samples, we conclude that these hypothetical possibilities are unsupported by the record before us and thus do not have any substantial weight in our totality of the circumstances analysis.”); Weikert, 504 F.3d at 14 (noting absence of evidence in the record showing misuse of DNA information stored in CO-DIS); Amerson, 483 F.3d at 87 (same). If and when such changes occur, future courts will be available to consider actual facts and applications, and determine whether the law, as then constituted, violates the Constitution.
Setting aside Plaintiffs’ parade of horribles, California’s limited use of the DNA and the complete absence of any evidence of abuse lead us to conclude that the collection of information from “junk DNA” markers does not significantly intrude upon felony arrestees’ privacy.
B. The Government’s interests in prison administration and law enforcement
The Government has four key interests we weigh on the other side of the balance: identifying arrestees, solving past crimes, preventing future crimes, and exonerating the innocent.
1. Identification of arrestees
The amended DNA Act’s primary purpose is to identify arrestees. See Cal.Penal Code § 295.1(a) (“The Department of Justice shall perform DNA analysis ... pursuant to this chapter only for identification purposes”). This interest is longstanding and unobjectionable. “[W]hen a suspect is arrested upon probable cause, his identification becomes a matter of legitimate state interest.” Jones v. Murray, 962 F.2d 302, 306 (4th Cir.1992); see also Kriesel, 508 F.3d at 947 (“[Tracking ... identity is the primary consequence of DNA collection”).
“Identification” encompasses not merely a person’s name, but also other crimes to which the individual is linked. “Knowl *1063 edge of identity may inform an officer that a suspect is wanted for another offense, or has a record of violence or mental disorder.” Hiibel v. Sixth Judicial Dist Court of Nevada, Humboldt Cnty., 542 U.S. 177, 186, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004). “Whether an arrestee is possibly implicated in other crimes is critical to the determination of whether or not to order detention pending trial.” Mitchell, 652 F.3d at 414; see also Webster’s Third New International Dictionary 1123 (2002) (broadly defining “identity” as “the condition of being the same with something described, claimed, or asserted or of possessing a character claimed”). The collection and use of DNA for identification purposes is substantially identical to a law enforcement officer obtaining an arrestee’s fingerprints to determine whether he is implicated in another crime. See Johnson v. Quander, 440 F.3d 489, 498 (D.C.Cir. 2006) (“[T]he process of matching one piece of personal information against government records does not implicate the Fourth Amendment.”).
Plaintiffs contend that DNA profiling is unnecessary because law enforcement officers already identify arrestees using traditional fingerprinting. However, this argument ignores the significant advantages of DNA profiling over fingerprinting. Criminals can easily hide their fingerprints by wearing gloves, but they cannot mask their DNA. See Mitchell, 652 F.3d at 414. DNA testing provides “the capacity to identify or to exclude individuals, quickly, accurately, and at reasonable expense.” Amerson, 483 F.3d at 89. “[F]or purposes of identifying a particular person as the defendant, a DNA profile is arguably the most discrete, exclusive means of personal identification possible.” People v. Robinson, 47 Cal.4th 1104, 1134, 104 Cal.Rptr.3d 727, 224 P.3d 55 (2010) (internal quotation marks omitted). Nothing in the Constitution compels us to adopt a Luddite approach that would prevent the Government from using this new and highly effective tool to replace (or supplement) older ones.
Plaintiffs also assert that the Government takes “months” to analyze DNA samples, the effect of which is to show that DNA analysis does not advance the Government’s interest in identifying arrestees. This argument exaggerates the facts: on average, Government analysis of DNA takes 31 days, but some samples have been processed in as few as five days. Although only of persuasive value, Plaintiffs also ignore the high likelihood that DNA technology will improve and substantially reduce processing times. Moreover, even at current processing rates, DNA analysis can be highly effective. For example, California’s Criminal Justice Realignment legislation, Assembly Bill 109, Stats.2011, Ch. 15, which went into effect on October 1, 2011, requires the transfer of many State prisoners to county jails. To reduce overcrowding in county jails, the statute allows prisoners to be released on their own recognizance sixty days after their arrest, subject to a discretionary review by the county. Collecting DNA at the time of arrest will help the county determine whether a prisoner is linked to other crimes before deciding whether to release the prisoner. Because release cannot occur before sixty days after arrest, the 31-day average processing time will give counties adequate time to compare arrestees’ DNA with current and past crime data before they are released.
2. Solving past crimes
DNA’s remarkable ability to accurately identify arrestees is a sufficiently compelling interest to justify the 2004 Amendment. However, the DNA database also serves other important law enforcement purposes. By accurately identifying arrestees, the DNA database also helps solve past crimes. Solving crimes is a legitimate *1064 factor in our totality of the circumstances analysis because it “helps bring closure to countless victims of crime who long have languished in the knowledge that perpetrators remain at large.” Kincade, 379 F.3d at 839; see also Mitchell, 652 F.3d at 414-415 (“Collecting DNA samples from arrestees can speed both the investigation of the crime of arrest and the solution of any past crime for which there is a match in CODIS.”).
Law enforcement officials already have used California’s expanded database to solve numerous past crimes. As of October 31, 2009 — ten months after Proposition 69 took effect — felony arrestee DNA samples had aided California police in 291 database hits. Matches from offender DNA profiles to crime scene profiles increased by approximately 50 percent between 2008 and 2009, when Proposition 69 took effect.
For example, in March 2009, police collected Donald Carter’s DNA when he was arrested in Sacramento for possession of a controlled substance. Three months later, the police, using the DNA database, linked his profile to DNA collected from a 1989 murder of an 80-year-old woman. Similarly, Rene Hernandez, who had no prior felony convictions, was arrested on August 16, 2009 for felony assault in Santa Cruz County, and his DNA was collected at that time. In October 2009, the DNA database matched his profile to DNA that was collected from the victim of a February 2009 sexual assault and robbery.
As California continues to add felony arrestees’ DNA to its database, law enforcement officers will undoubtedly solve even more past crimes.
3. Preventing future crimes
DNA analysis not only solves past crimes, but it helps police prevent crimes from occurring in the future. By implementing the 2004 Amendment, law enforcement officials will have a catalogue of arrestees’ DNA, a tool that will undoubtedly help solve and prevent future crimes.
The mere existence of the DNA database creates a strong deterrent effect. As discussed supra, it is much easier for a criminal to cover his fingerprints than it is to prevent any DNA from being left at a crime scene. A felony arrestee is less likely to commit another crime in the future if he knows that his DNA is catalogued in the State database. See, e.g., Kincade, 379 F.3d at 839 (stating that mandatory DNA profiles of convicted felons “fosters society’s enormous interest in reducing recidivism”); Jones, 962 F.2d at 311 (“[T]he Commonwealth’s interest in combatting and deterring felony recidivism justifies the involuntary taking of the sample and the creation of the DNA data bank as reasonable in the context of the Fourth Amendment.”).
4. Exonerating innocent suspects
By helping identify the actual perpetrators of crimes, the DNA database also allows law enforcement officers to eliminate innocent persons from suspect lists. See Kincade, 379 F.3d at 839 n. 38 (DNA fingerprinting “promptly clears thousands of potential suspects”); United States v. Sczubelek, 402 F.3d 175, 185 (3d Cir.2005) (“[T]he DNA samples will help to exculpate individuals who are serving sentences of imprisonment for crimes they did not commit and will help to eliminate individuals from suspect lists when crimes occur.”).
DNA databases have proven remarkably effective in exonerating the innocent. According to the Innocence Project, there have been 273 post-conviction DNA exonerations in the United States since 1989. In 123 of the cases, the true suspects or perpetrators were also identified.
The case of David Allen Jones is a powerful illustration of the benefits of arrestee *1065 DNA sampling. Jones, a mentally disabled janitor, was wrongly convicted in 1995 for three murders in the Los Angeles area. See Andrew Blankstein, et al., DNA Analysis Links Inmate to 12 Slayings, L.A. Times, Oct. 23, 2004, at A1. Jones spent nearly nine years in prison. He was released in 2004, after DNA collected at two of the murder scenes was linked to the DNA profile of Chester Dwayne Turner. Although Turner had been arrested 20 times between 1987 and 2002, his DNA sample was not collected until after he was convicted of rape in 2002. Id. Had the 2004 Amendment been in effect in 1995, it is likely that Jones never would have been imprisoned because police would have had access to Turner’s DNA profile.
There are few greater injustices than the wrongful imprisonment of an innocent person. The privacy intrusion caused by a buccal swab of a felony arrestee is minor compared to society’s compelling goal of ensuring that innocent people are exonerated.
C. Balancing
Given the arrestee’s diminished privacy interests; the de minimis nature of the physical intrusion entailed in the taking of a buccal swab; the carefully circumscribed scope of the DNA information being extracted; the stringent limits on the manner in which that information may be used; and the well-established law enforcement interest in obtaining arrestees’ identifying information, and further, to deter future criminal acts and to exculpate innocent arrestees — the balance of interests tilts strongly in favor of upholding the constitutionality of the 2004 Amendment.
We emphasize that our decision deals solely with DNA extraction, processing, and analysis as it presently exists, and is enforced. We acknowledge that future developments in the law could alter the constitutionality of the DNA Act, as amended. See Kincade, 379 F.3d at 842 n. 3 (Gould, J., concurring in the judgment). But we cannot test the amended DNA Act’s current legality in light of uncertain future amendments to the law, which themselves would likely violate the DNA Act, as amended by the 2004 Amendment.
CONCLUSION
Because the 2004 Amendment does not violate the Fourth Amendment as applied to the Plaintiffs, the facial challenge also fails because Plaintiffs cannot “establish that no set of circumstances exists under which the Act would be valid.” Salerno, 481 U.S. at 745, 107 S.Ct. 2095. Accordingly, we hold that the district court did not err in determining that Plaintiffs did not establish a likelihood of success on the merits, and we affirm its denial of the preliminary injunction.
AFFIRMED.

. In their appellate filings, Plaintiffs have merged their Fourteenth Amendment claim into their Fourth Amendment claim.

. Two recent opinions addressed the constitutionality of such requirements, but we are not bound by either.
In United States v. Pool, 621 F.3d 1213 (9th Cir.2010), a three-judge panel of our court upheld a federal statute that required DNA collection as a condition of pre-trial release. The case was called en banc, thereby vacating the panel opinion. On September 19, 2011, before an en banc panel heard argument, the appeal was dismissed as moot because the defendant had pleaded guilty. Because the panel opinion was vacated, we do not rely on Pool’s reasoning.
The California Court of Appeal, in People v. Buza, 197 Cal.App.4th 1424, 129 Cal.Rptr.3d 753 (Ct.App.2011), held that California’s DNA Act's requirement for felony arrestees to provide their DNA under the 2004 Amendment violates the United States Constitution. We are not bound by Buza for three reasons. First, federal courts are not required to follow state courts’ interpretations of federal law. See Congoleum Corp. v. DLW Aktiengesellschaft, 729 F.2d 1240, 1242 (9th Cir.1984). Second, Buza relies primarily on Ninth Circuit dissents, not the controlling, majority opinions. Finally, the California Supreme Court granted review of Buza on October 19, 2011, thereby automatically depublishing Buza. Cal. Rules of Court 8.1105(e); 8.1115. "Although we are not precluded from considering unpublished state court opinions, we are not bound by them either.” Nunez by Nunez v. City of San Diego, 114 F.3d 935, 943 n. 4 (9th Cir.1997) (internal citation omitted).

. Plaintiffs contend that, because approximately one-third of arrestees are never convicted, the 2004 Amendment results in the Government's maintaining a database of DNA profiles of innocent citizens. This argument ignores the fact that an arrestee who is not convicted may ask the trial court to expunge the DNA profile from the database. Cal.Penal Code § 299(b). This process effectively addresses Plaintiffs’ concerns that California will build a database of DNA profiles of people who are ultimately found innocent.

. As in Schmerber, the parties in this case are not among “the few who on grounds of fear, concern for health, or religious scruple might prefer some other means of testing.... We need not decide whether such wishes would have to be respected.” 384 U.S. at 771, 86 S.Ct. 1826.

. However, we disagree with our colleague's dismissal as “dictum” of the Supreme Court's clear statement that "[tjhere is thus support in our cases for the view that the Fourth Amendment would permit seizures for the purpose of fingerprinting, if there is reasonable suspicion that the suspect has committed a criminal act, [and] if there is a reasonable basis for believing that fingerprinting will establish or negate the suspect’s connection with that crime.” Hayes, 470 U.S. at 816-17, 105 S.Ct. 1643 (1985).

. See Hayes, 470 U.S. at 813-14, 105 S.Ct. 1643 ("[T]here was no probable cause to arrest, no consent to the journey to the police station, and no judicial authorization for such a detention for fingerprinting purposes.”); Davis, 394 U.S. at 725, 89 S.Ct. 1394 (‘‘[T]he State conceded that the arrest on December 12 and the ensuing detention through December 14 were based on neither a warrant nor probable cause”); Ortiz-Hernandez, 427 F.3d at 575 (”[W]e cannot say that the district court clearly erred when it ruled that considering the totality of evidence upon which Detective Anderson relied when he placed Ortiz-Hernandez under formal arrest, the evidence was insufficient to establish probable cause."); Garcia-Beltran, 389 F.3d at 865 (”[T]he government conceded that the police did not have probable cause to arrest Garcia-Beltran”).