Filed 11/15/13 Modified and certified for partial publication 12/4/13 (order attached)
Opinion following transfer from Supreme Court

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

THE PEOPLE,

    Plaintiff and Respondent,

    v.

JUSTIN SAMUEL LOWE,

    Defendant and Appellant.

D059007

(Super. Ct. No. RIF132717)

APPEAL from a judgment of the Superior Court of Riverside County, Harry A. Staley, Judge. Affirmed as modified, with directions.

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Enid A. Camps and Lise S. Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

This case arises out of a series of burglaries, forcible sex crimes, and robberies that Justin Samuel Lowe committed in the City of Riverside between November 2003 and October 2006. Lowe's identity was established by fingerprint evidence; witness identification; and, of particular importance in this appeal, his unique DNA profile. That profile was derived from a buccal (inner cheek) swab sample taken from him without a warrant in October 2006, while he was under lawful arrest for one of the sex crimes charged in this case, as authorized by the provisions of Penal Code[1] sections 296, subdivision (a)(2)(C) (hereafter section 296(a)(2)(C)) and 296.1, subdivision (a)(1)(A) (hereafter section 296.1(a)(1)(A)), as amended effective November 3, 2004, by the passage of Proposition 69 (also known as the DNA Fingerprint, Unsolved Crime and Innocence Protection Act & hereafter referred to as the 2004 Amendment).

*Denial of Lowe's Motion In Limine To Suppress DNA Evidence*

Lowe brought an opposed motion in limine to exclude "all DNA evidence" the police obtained from him while he was under arrest, claiming the evidence was obtained in violation of the Fourth Amendment to the United States Constitution. The court denied Lowe's suppression motion, finding that he was under lawful arrest when the DNA sample was taken and that the statutory provisions authorizing the buccal swab were constitutional.

---

[1] Undesignated statutory references will be to the Penal Code.

*Verdicts*

In July 2010, following the trial in this matter, a Riverside County jury found Lowe guilty of all 13 offenses charged in the third amended information: three counts of forcible oral copulation (§ 288a, subd. (c)(2); counts 1, 5, 13) (victims: C.D., Jennifer & Amanda, respectively); one count of attempted rape (§§ 664, 261, subd. (a)(2); count 2) (victim: Victoria); two counts of first degree residential burglary "with intent to commit theft and a felony" (§ 459; counts 3, 7); three counts of robbery (§ 211; counts 4, 8, 12) (victims: Jennifer, Fran Whitton & Amanda, respectively); one count of rape (§ 261, subd. (a)(2); count 6) (victim: Jennifer); one count of attempted robbery (§§ 664, 211; count 9) (victim: Johanna Grosso); one count of misdemeanor child annoyance (§ 647.6, subd. (a); count 10) (victim: Whitton's granddaughter); and one count of kidnapping for rape or robbery (§ 209, subd. (b)(1); count 11) (victim: Amanda).

With respect to counts 1, 5, and 6, the jury found true allegations that Lowe entered an inhabited dwelling to commit a violent sex offense, committed the offenses during a burglary, and used a deadly or dangerous weapon (a handgun) within the meaning of section 667.61, subdivisions (d)(4), (e)(2), and (e)(4), respectively.

As to counts 8, 9, 11, and 12, the jury found true allegations that Lowe personally used a deadly or dangerous weapon (a knife) within the meaning of section 12022, subdivision (b).

With regard to count 13, the jury found true allegations that Lowe was armed with a deadly weapon (a knife) within the meaning of section 12022.3, subdivision (b); he kidnapped the victim and his movement of her increased the risk of harm within the

3

meaning of section 667.61, subdivisions (d)(2), (e)(1); and he personally used a dangerous or deadly weapon (a knife) within the meaning of section 667.61, subdivision (e)(4).

Finally, the jury found true the special allegation that Lowe committed or attempted to commit rape or oral copulation against multiple victims within the meaning of section 667.61, subdivision (e)(5).

*Sentence*

The court sentenced Lowe to a determinate term of 15 years eight months plus a consecutive indeterminate prison term of 107 years to life, calculated as follows: *count 1*: 25 years to life; *count 2*: one year; *count 3*: one year four months; *count 4*: one year four months; *count 5*: 25 years to life; *count 6*: 25 years to life; *count 7*: one year four months; *count 8*: six years plus one year for the use of the knife; *count 9*: eight months plus four months for the use of the knife; *count 10*: 180 days, concurrent; *count 11*: seven years to life plus one year for the use of the knife; *count 12*: one year four months plus four months for the use of the knife; and *count 13*: 25 years to life.

*Contentions*

Challenging the court's denial of his motion to suppress the swab DNA evidence, Lowe contends that "section 296, as applied in this case to compel [him] to provide a DNA sample as an investigative tool, violates the Fourth Amendment protection against

4

unreasonable searches and seizures."[2] He also contends the sentences imposed for his two first degree burglary convictions (counts 3 and 7) and for his conviction of kidnapping Amanda for rape or robbery (count 11) must be stayed under section 654 because the sentences "constitute improper multiple punishment."

In our unpublished opinion in this matter, we held the 2004 Amendment does not violate the Fourth Amendment, and, thus, the court properly denied Lowe's suppression motion. We also concluded the judgment must be modified to stay under section 654 the execution of the prison sentence of one year four months the court imposed for Lowe's count 3 conviction of first degree burglary. We affirmed the judgment as modified.

The California Supreme Court granted review (S207634) and subsequently transferred the matter back with directions that we vacate our decision and reconsider the matter in light of the United States Supreme Court's decision in *Maryland v. King* (2013) ___ U.S. ___ [133 S.Ct. 1958, 186 L.Ed.2d 1] (*King*).

In this opinion, we conclude our prior decision is consistent with *King*. Accordingly, we restate our analysis and conclusions that (1) the 2004 Amendment authorizing the mandatory and warrantless collection and analysis of buccal swab DNA samples from felony arrestees does not violate the Fourth Amendment, and, thus, the court properly denied Lowe's suppression motion; and (2) the judgment must be modified

---

[2] The California Supreme Court has granted review on the issue presented here of whether the compulsory collection of biological samples from all adult felony arrestees for DNA testing under the DNA Act (specifically, §§ 296(a)(2)(C), 296.1(a)(1)(A)) violates the Fourth Amendment to the United States Constitution. (*People v. Buza* (2011) 197 Cal.App.4th 1424, review granted Oct. 19, 2011, S196200.)

to stay under section 654 the execution of the prison sentence of one year four months the court imposed for Lowe's count 3 conviction of first degree burglary. As modified, the judgment is affirmed.

FACTUAL BACKGROUND

A. *The People's Case*

1. *Count 1* (*Forcible Oral Copulation of C.D.*)

In the morning on November 11, 2003, shortly after she went to sleep. C.D. awoke to a loud noise followed by the sound of breaking glass. A tall Black man dressed in black clothing and wearing a black mask, later identified as Lowe through DNA and fingerprint evidence (discussed, *post*), entered her room and pointed a gun in her face. Lowe asked for money and laughed when she showed him a jar containing some change. Lowe told C.D. he was not "leaving without getting anything," cursed at her, put the gun to her head, threatened to "blow [her] brains out," and told her to take off her shirt. When C.D. refused and said she was a virgin and a Christian, Lowe told her she was going to give him a "blow job." Lowe pulled his pants down and exposed his penis. When C.D. said she had never done this before, Lowe told her, "Oh, then this is the biggest dick you've ever seen" and warned he would shoot her if he felt her teeth.

C.D. orally copulated Lowe for 15 to 20 minutes, which she testified "seemed like forever." After Lowe ejaculated into her mouth, C.D. spat his semen into the waste basket. Before he left, Lowe threatened to return if he saw any police in the area.

6

C.D. called the police, who recovered the waste basket. Liquid from the waste basket tested positive for saliva and semen. DNA analysis in 2004 did not match the semen to any source.

In 2006 when the police collected the buccal swab from Lowe, they found his DNA matched the DNA from the waste basket. Lowe's finger and palm prints matched prints taken from both the sliding glass door that was broken during the incident and from C.D.'s table.

2. *Count 2* (*Attempted Rape of Victoria*)

On November 21, 2003, sometime between 10 p.m. and midnight and 10 days after he forced C.D. to orally copulate him, Lowe entered a house rented by Victoria, who at that time was a student at the University of California at Riverside (UCR). He was again dressed in black, wearing a black ski mask and holding a gun. Lowe grabbed Victoria, who was screaming, by the arms as they struggled, and then told her to "[s]hut the fuck up and sit down on the bed." Lowe sat next to her on the bed and touched her right breast over her clothing. Victoria stood up, screaming, and when Lowe started pulling her drawstring shorts down, she held on to her shorts and crouched down. Victoria told Lowe, "I'll give you money. Just take whatever you want and leave."

As Victoria continued to scream, Lowe said, "Okay. Give me your fucking money." Victoria gave him $13, which was all the money she had in her wallet. Lowe, who became very angry, responded, "What the fuck am I going to do with $13?" Lowe took the money and left.

7

### 3. Counts 3 Through 6 (Burglary, Robbery, Forcible Oral Copulation and Rape of Jennifer)

In the evening on March 24, 2004—about four months after he attempted to rape Victoria—Lowe, wearing dark jeans, a dark sweater, and a dark mask, returned to Victoria's house and found a student named Jennifer alone in the kitchen. Lowe popped up from behind the kitchen counter and pointed a gun at Jennifer and told her he would kill her if she screamed. Jennifer and Lowe went to her bedroom and she gave him $12. When he asked whether that was all the money she had, Jennifer told him she was a college student and did not have any money.

Lowe ordered Jennifer to take off her clothes, and she began to cry. Lowe told her he would shoot her if she did not undress right away. When Jennifer complied, Lowe fondled and put his mouth on her breasts, pulled down his pants, and told her to give him oral sex. Jennifer testified that she complied because she "just wanted to survive."

About five minutes later, Lowe directed Jennifer to get on the bed on her hands and knees so he could enter her from behind and told her, "You know you want it." Jennifer complied because she was afraid Lowe would hurt or kill her. Lowe set down his gun, put his penis in Jennifer's vagina from behind and asked her, "Have you ever been with a gangster before?" Lowe later told her to roll over on her back, she complied, and he continued to have intercourse with her.

A couple of minutes later, Lowe asked Jennifer whether she wanted him to ejaculate inside of her or on her. Out of self-preservation, and wanting to preserve evidence so that Lowe would be caught, Jennifer told him to ejaculate inside her and he

8

did.  Lowe got off of Jennifer and wiped himself with her sweater.  He then left after telling her he would return in a couple of months.

DNA extracted from a sample of sperm taken from Jennifer at the hospital matched Lowe's DNA profile.  Fingerprints and a palm print obtained at the scene of the crime matched Lowe's left thumb and palm prints.

4.  *Counts 7 Through 10* (*Burglary, Robbery, Attempted Robbery, and Annoying a Child*)

In the afternoon on October 3, 2006, a Black man later identified as Lowe knocked on the front door and rang the doorbell for several minutes at Johanna Grosso's home.  Grosso's then-12- or 13-year-old granddaughter, who was inside the home, did not answer the door.  Instead, she called her mother (Grosso's daughter) on her cell phone and said she was scared because a Black man she did not know was at the door and was not leaving.

Lowe was still near the front door when Grosso came home with her friend, Fran Whitton, and Whitton's granddaughter, who was about 15 years of age at the time of this incident.  Lowe told Grosso he was selling alarm systems.  When Grosso told him she already owned a security system, Lowe asked if he could use the bathroom inside the house.  Grosso allowed him to do so, and Grosso's daughter arrived while Lowe was using the bathroom.  Grosso's daughter testified she saw a "bluish" PT Cruiser parked in an odd spot on a hill, on a neighbor's property, above the street.  When she went inside the house, Grosso told her she was uncomfortable because a man (Lowe) was in the bathroom.  Grosso's daughter grabbed a knife, but Lowe left without incident.

9

Lowe returned, however, at around 7:30 p.m. that evening, and entered the house with a knife, which he held to Whitton's granddaughter's neck as she led him to the room where the other women were. Lowe told Whitton's granddaughter, "Don't be scared. I'm not going to hurt anybody. I just need money." Whitton's granddaughter repeated that warning to the other women. Whitton gave Lowe maybe $30 or $50 from her wallet because she was afraid. Grosso dumped the contents of her purse on the table and Lowe took the change.

At some point Whitton's granddaughter fell to the floor. Lowe pulled her up and said she was faking.

Lowe told Grosso and Whitton to get into the bathroom and close the door, and send the girl to him. Lowe, holding the knife, told Grosso's granddaughter to get into the closet and she complied. Lowe then told Whitton's granddaughter, "[L]et's make out," and put his hand on her shoulder and waist. She rebuffed Lowe and he eventually left.

About a week later, on October 11, 2006, police showed two photographic lineups─one with black and white photographs and the other with color photographs, each of which contained a photograph of Lowe─to four of the women (Grosso, Grosso's daughter, Grosso's granddaughter, and Whitton's granddaughter) who were present during the October 3 incident. When the lineup of black and white photographs─in which Lowe's photograph was photograph No. 1─ was shown to Grosso, Grosso's daughter, and Grosso's granddaughter, Grosso identified the man in photograph No. 1 (Lowe) as the suspect with a 99 percent degree of certainty; but Grosso's daughter was unable to make an identification, and Grosso's granddaughter said the men in photographs Nos. 1 and 2

10

looked like the suspect but she was less than 50 percent sure about the man in photograph No. 1.  When the color lineup—in which Lowe's photograph was photograph No. 5— was shown to Whitton's granddaughter, she identified the man in that photograph (Lowe) with 100 percent certainty.

5.  *Counts 11 Through 13* (*Kidnapping for Rape or Robbery, Robbery, and Forcible Oral Copulation of Amanda*)

At around noon on October 3, 2006—on the same day as the incident at Grosso's house—Amanda, who was then 18 years of age, was on her way to her class at UCR when a tall Black man in his 20's, whom she later identified in person at the police station as Lowe, approached her and tried to talk to her.  Amanda testified she did not talk to him. Lowe followed her to the elevator, again tried to talk to her, followed her off the elevator, and walked next to her down a hallway.

As they walked, Lowe, who had a knife in his hand, suddenly grabbed Amanda by the neck, covering her mouth, and pulled her about 20 feet into a handicapped stall in the women's bathroom.  Holding the knife to Amanda's neck, Lowe told her he would not hurt her if she did what he told her to do.  He told her that he had a "thing" for Asians and that his name was "Justin."  Lowe later told her that was not his real name; he had changed it to "Marcus."  Amanda testified that Lowe had a black and white tattoo on his arm that looked something like a cross and that he was wearing tan Nike shoes.

Amanda also testified that Lowe, who was standing in the stall with her, put her on the toilet and told her he wanted to have sex with her.  When she said, "No," Lowe told her he was in charge and to do as he said.  When another person entered the bathroom,

11

Lowe pressed the knife against Amanda's face and told her he would hurt her if she made any noise.

After the person left the bathroom, Lowe undressed, pressed his penis against Amanda's face, and told her to lick it. He then put his penis in her mouth. Amanda had never seen a penis, and she felt like she was going to vomit when Lowe put his penis into her mouth. She stopped giving Lowe oral sex, backed away, and cried. Lowe pulled her back toward him by pulling her hair. This happened many times with Lowe reminding her he had the knife in his hand. Lowe removed Amanda's clothes, grabbed her breasts and bit her nipples, causing pain.

Amanda testified this lasted a "very, very long time." Lowe then grabbed Amanda's hand and made her masturbate him until he ejaculated on her arm and hand. Lowe tried to clean up, asked for money, and then tried to grab Amanda's purse, but she took it before he could do so. She gave him $60 of the $80 she had for books and living expenses for the week. Lowe also tried to take her watch but she resisted, telling Lowe the watch was a gift from her grandmother. Lowe left after telling Amanda not to call the police and to wait in the bathroom because he was going to come back. Eventually, she washed herself and left the bathroom, and a friend took her to the police.

6. *Lowe's Arrest, Car Search, and Buccal Swab DNA Sample*

Six days later, on October 9, 2006, a police officer saw a blue PT Cruiser illegally parked on the UCR campus. As the officer was speaking to the driver, Lowe approached the car. The officer arrested Lowe, who matched the description of the assailant on campus, on a misdemeanor traffic warrant. Lowe, who acknowledged the PT Cruiser

12

belonged to his mother, consented to a search of the car. The police found a knife in the car that Lowe intimated was his and that, according to Amanda at trial, resembled the one used during the sexual assault on her.

The police also found in the car a laptop computer with Lowe's name in the user profile. Investigators determined that the computer found in the PT Cruiser had been used earlier in the year to visit Internet sites with the titles "All Rape," "Brutal Rapes," and "Free Rapes On Line."

The police took a buccal swab DNA sample from inside Lowe's cheek after his arrest. Lowe's DNA profile matched the profile of the samples of saliva taken from Amanda's neck and semen taken from her arms and pants.

7. *Uncharged Crime*

Another student testified that at about 1:00 p.m. on August 10, 2006, she was jogging from the recreation center at UCR to her apartment complex. As she was running between two dorms, a Black man running towards her made eye contact with her and said, "Hey, how you doing?" He grabbed her breast and ran off.

The student identified Lowe's photograph in a photographic lineup the police showed her. She told the police she was not 100 percent sure of her identification because she thought the suspect who grabbed her during the jogging incident was lighter skinned.

B. *The Defense Case*

The defense presented evidence that other tall African-American men who matched or partially resembled the description of the suspect were seen in the areas

13

where the crimes against C.D., Victoria, and Jennifer were committed, at around the time of those crimes.

A defense investigator who researched guns on the Internet testified that the description of the gun used in some of the crimes indicated the gun was a Daisy BB pistol, not a firearm.

DISCUSSION

I

*DENIAL OF LOWE'S SUPPRESSION MOTION;*
*CONSTITUTIONALITY OF THE DNA ACT*

Lowe challenges the court's denial of his motion to suppress the buccal swab DNA evidence obtained from him under the 2004 Amendment without a warrant while he was under arrest, contending that "section 296, as applied in this case to compel [him] to provide a DNA sample as an investigative tool, violates the Fourth Amendment protection against unreasonable searches and seizures."  We hold that the 2004 Amendment authorizing the mandatory and warrantless collection and analysis of buccal swab DNA samples from felony arrestees does not violate the Fourth Amendment, and, thus, the court properly denied Lowe's suppression motion.

A.  *Background: Denial of Lowe's Motion In Limine To Suppress DNA Evidence*

Lowe brought an in limine motion under section 1538.5, subdivision (a) to exclude "all DNA evidence" obtained from him while he was under arrest, asserting "there [was] no warrant or exigent circumstance," and, thus, the evidence was "obtained in violation of

14

the search and seizure clause of the [Fourth] Amendment to the [United States] Constitution."

The prosecution opposed the motion, arguing the police lawfully obtained the DNA sample pursuant to the mandatory provisions of section 296 (a)(2)(C) by swabbing Lowe's mouth after he waived his *Miranda*[3] rights, admitted he sexually assaulted Amanda, and was lawfully arrested.

At the hearing on the motion, a campus police officer with the UCR Police Department testified for the prosecution that on October 9, 2006, Amanda identified Lowe at an in-field lineup as the man who forced her to orally copulate him a few days earlier on October 3 and that her identification of Lowe provided the officer with probable cause to arrest him. The officer stated that when Amanda identified Lowe, she also identified his tattoo and the shoes he was wearing.

The officer also testified that Lowe thereafter waived his *Miranda* rights and agreed to speak with him. During the interview, Lowe made incriminating statements about his involvement in a sexual assault on Amanda. The officer stated he arrested Lowe and then made arrangements with a detective to take a buccal swab DNA sample from Lowe. The detective came to the police station and properly collected the sample.

The parties stipulated that the sample was collected without a warrant and that the court could consider the transcript of Lowe's police interview. The transcript showed the officer informed Lowe early in the interview that he was under arrest for sexual assault.

---

3    *Miranda v. Arizona* (1966) 384 U.S. 436.

15

The officer advised Lowe of his *Miranda* rights, and Lowe waived those rights and agreed to speak with the officer.  Lowe initially told the officer, "I'm being accused of something I didn't do."  The officer told Lowe that semen containing DNA had been collected from the victim's pants, and Lowe's DNA would be taken later that day.  He also told Lowe that the victim had identified him as her assailant, his knife was found in his mother's car, and fingerprints had been collected from the crime scene.  The transcript shows that, shortly thereafter, Lowe made numerous incriminating statements showing he sexually assaulted and robbed Amanda.

Following oral arguments, the court denied Lowe's suppression motion, finding that Lowe was under lawful arrest when the DNA sample was taken, and that the statute authorizing the warrantless taking of the sample is constitutional.

B.  *Statutory Scheme*

Since 1984, California law enforcement officials have been authorized to collect forensic identification blood, saliva or buccal swab samples from persons *convicted* of certain serious crimes.  (See former § 290.2, added by Stats. 1983, ch. 700, § 1.)

In 1998, the Legislature enacted the DNA and Forensic Identification Database and Data Bank Act of 1998 (§ 295 et seq.; Stats. 1998, ch. 696, § 2) (the DNA Act), which required "DNA and forensic identification data bank samples" from all persons convicted of specified offenses.  (§ 295, subd. (b)(2).)[4]  The purpose of the program

---

[4]     "DNA data base and data bank acts have been enacted in all 50 states as well as by the federal government.  (See 42 U.S.C. §§ 14131–14134; and see Annot., Validity,

16

created by this legislation "is to assist federal, state, and local criminal justice and law enforcement agencies within and outside California in the expeditious and accurate detection and prosecution of individuals responsible for sex offenses and other crimes, the exclusion of suspects who are being investigated for these crimes, and the identification of missing and unidentified persons, particularly abducted children." (§ 295, subd. (c).)

At the November 2004 general election, California voters amended and added various provisions to the DNA Act by enacting Proposition 69 (the 2004 Amendment). (Voter Information Guide, Gen. Elec. (Nov. 2, 2004), text of Prop. 69, sec., p. 135 & sec. III, pp. 135-144; *Haskell v. Harris* (2012) 669 F.3d 1049, 1051 (*Harris*).) Proposition 69 significantly enlarged the scope of persons subject to warrantless DNA seizures by, among other things, providing that beginning January 1, 2009, warrantless seizure of DNA would be required of any adult *arrested* for or charged with any felony. (§ 296(a)(2)(C);[5] *Harris*, at p. 1051; Voter Information Guide, *supra*, text of Prop. 69, sec. 3 adding § 296(a)(2)(C), p. 137.)

---

Construction, and Operation of State DNA Database Statutes (2000) 76 A.L.R.5th 239, 252.)" (*Alfaro v. Terhune* (2002) 98 Cal.App.4th 492, 505.)

[5]    Section 296(a)(2)(C) provides:  "(a) The following persons shall provide *buccal swab samples* . . . required pursuant to this chapter for law enforcement identification analysis:  [¶] . . . [¶] (2) *Any adult person who is arrested for or charged with* any of the following felony offenses:  [¶] . . . [¶] (C) Commencing on January 1 of the fifth year following enactment of the act that added this subparagraph, as amended, any adult person arrested or charged with *any felony offense*."  (Italics added.)

17

As amended by the 2004 Amendment, the DNA Act provides that such collection of DNA from felony arrestees must take place "immediately following arrest, or during the booking . . . process or as soon as administratively practicable after arrest, but, in any case, prior to release on bail or pending trial or any physical release from confinement or custody."  (§ 296.1(a)(1)(A).)[6]  The taking of a DNA sample is mandatory; law enforcement officials lack discretion to suspend this requirement.  (§ 296, subd. (d); *People v. King* (2000) 82 Cal.App.4th 1363, 1373.)  Furthermore, collection of DNA samples for analysis is ordinarily "limited to collection of inner cheek cells of the mouth (buccal swab samples)."  (§ 295, subd. (e).)

After the DNA sample is taken, it is sent to the DNA Laboratory of the California Department of Justice (DOJ), which is responsible for the management and administration of the state's DNA and Forensic Identification Database and Data Bank Program and which stores, correlates and compares forensic identification samples for use in criminal investigations.  (§§ 295, subds. (f), (g), (i)(1)(C); 295.1, subd. (c); *People v. King*, *supra*, 82 Cal.App.4th at pp. 1368-1370.)  The DOJ is required to perform the

---

6        Section 296.1(a)(1)(A) provides:  "(a) The . . . samples . . . required by this chapter shall be collected from persons described in subdivision (a) of Section 296 for present and past qualifying offenses of record as follows:  [¶] (1) Collection from any adult person following arrest for a felony offense as specified in subparagraph[] . . . (C) of paragraph (2) of subdivision (a) of Section 296:  [¶] (A) Each adult person arrested for a felony offense as specified in subparagraph[] . . . (C) of paragraph (2) of subdivision (a) of Section 296 shall provide the buccal swab samples . . . required pursuant to this chapter immediately following arrest, or during the booking or intake or prison reception center process or as soon as administratively practicable after arrest, but, in any case, prior to release on bail or pending trial or any physical release from confinement or custody."

DNA analysis "only for identification purposes." (§ 295.1, subd. (a).) A genetic profile is created from the sample based on 13 genetic markers known as "junk DNA," which are referred to as junk because they are not linked to any known genetic traits. (*Harris*, *supra*, 669 F.3d at p. 1051; see also *King*, *supra*, 133 S.Ct. at pp. 1966-1967 ["The adjective 'junk' . . . apparently is intended to indicate that this particular noncoding region [of the DNA material in chromosomes], while useful and even dispositive for purposes like identity, does not show more far-reaching and complex characteristics like genetic traits."].) The resulting genetic profiles are so highly individuated that the chance of two randomly selected individuals sharing the same profile are "infinitesimal." (*United States v. Kincade* (9th Cir. 2004) 379 F.3d 813, 819 (*Kincade*), cert. den. sub nom. *Kincade v. United States* (2005) 544 U.S. 924.)

The laboratory uploads each DNA profile into California's DNA data bank, which is part of the Combined DNA Index System (CODIS), a nationwide collection of federal, state, and local DNA profiles that can be accessed by local, state and federal law enforcement agencies and officials. (*Harris*, *supra*, 669 F.3d at p. 1052; *Haskell v. Brown* (2009) 677 F.Supp.2d 1187, 1190.) "CODIS collects DNA profiles provided by local laboratories taken from arrestees, convicted offenders, and forensic evidence found at crime scenes." (*King*, *supra*, 133 S.Ct. at p. 1968.)

When the arrestee's DNA profile is uploaded into CODIS, it is compared to DNA samples collected from crime scenes. (*Harris*, *supra*, 669 F.3d at p. 1052.) In CODIS, the DNA profile does not include the name of the person from whom the DNA was collected or any case-related information. It includes a specimen identification number,

19

an identifier for the agency that provided the sample, and the name of the personnel associated with the analysis. (*Haskell v. Brown, supra,* 677 F.Supp.2d at p. 1190; *Kincade*, *supra*, 379 F.3d at p. 819, fn. 8.) If a "hit" is made, matching the DNA profile of the convicted offender or felony arrestee to a crime scene DNA sample, the arrestee's DNA sample is tested again for confirmation and, if the match is confirmed, CODIS notifies the submitting laboratory of the identity of the matching DNA profile, and the laboratory sends that information to the appropriate law enforcement agency. (*Harris*, *supra*, 669 F.3d at p. 1052.)

The 2004 Amendment specifically provides that DNA samples and profiles may be released only to law enforcement personnel and contains penalties for unauthorized use of the arrestee's "specimen, sample, or DNA profile" or unauthorized disclosure of DNA information. (§ 299.5, subds. (f), (i).)

A person whose DNA profile has been included in the DNA data bank may have his or her DNA sample destroyed and the searchable database profile expunged from the data bank program if he or she "has no past or present offense or pending charge which qualifies that person for inclusion within the . . . Data Bank Program and there otherwise is no legal basis for retaining the specimen or sample or searchable profile." (§ 299, subd. (a).) An arrestee ordinarily must wait until the statute of limitations has run before requesting the expungement, and the court must then wait 180 days before it can grant the request. The court's order is not reviewable by appeal or by writ petition, and the prosecutor can prevent expungement by objecting to the request. (§ 299, subds. (b)(1),

(c)(1), (c)(2)(D).) In the alternative, a person may seek expungement after being found factually innocent or not guilty of the underlying offense. (§ 299, subds. (b)(3), (b)(4).)

However, an individual may initiate expedited expungement proceedings by filing a request and supporting documentation with the DOJ DNA Database Program. (See the DOJ's website: <http://oag.ca.gov/sites/all files/pdfs/bfs/expungement_ app_instruc.pdf> [as of Nov. 6, 2013].) DOJ may grant an expungement request if the individual submits a three-page form and provides "sufficient documentation" of his or her identity, legal status, and criminal history to meet the requirements of section 299. (State of Cal. form DLE 244, <http://oag.ca.gov/sites/all files/pdfs/bfs/expungement_app_instruc.pdf> [as of Nov. 6, 2013].) Depending on the grounds for expungement, the required documentation may be a letter in support of expungement from a district attorney or prosecutor or a certified or file-stamped copy of a court order, opinion, docket, or minute order. If DOJ denies the request, the individual may initiate a court proceeding. (Expungement Request Instructions: <http://oag.ca.gov/sites/all files/pdfs/bfs/expungement_ app_instruc.pdf> [as of Nov. 6, 2013].) To do so, the individual must file a petition for expungement with proof of service of the petition on the DOJ's DNA Laboratory, as well as the trial court and prosecuting attorney of the county where the petitioner was arrested, the conviction was entered, or the disposition was rendered. (§ 299, subd. (c)(1); Judicial Council Forms, form CR–185 <http://www.courtinfo.ca.gov/forms/documents/cr185.pdf> [as of Nov. 6, 2013].)

C.  *Fourth Amendment Principles*

"The Fourth Amendment of the United States Constitution, which is enforceable against the states as a component of the Fourteenth Amendment's guaranty of due process of law[, protects] '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'"  (*People v. Williams* (1999) 20 Cal.4th 119, 125, quoting U.S. Const., 4th Amend.)

As the text of the Fourth Amendment indicates, "reasonableness" is the ultimate measure of the constitutionality of a governmental search, and whether a particular search meets the reasonableness standard is judged by examining "the totality of the circumstances" and balancing the intrusion on the individual's Fourth Amendment privacy interests against its "promotion of legitimate governmental interests."  (*Samson v. California* (2006) 547 U.S. 843, 848; *People v. Robinson* (2010) 47 Cal.4th 1104, 1120.)

Subject only to a few well-delineated exceptions, warrantless searches are per se unreasonable under the Fourth Amendment, and the state bears the burden of showing the search at issue is reasonable and therefore constitutional.  (See *People v. Williams, supra,* 20 Cal.4th at p. 127.)

D.  *Analysis*

Applying the "totality of the circumstances" test, balancing the intrusion of the challenged search on privacy interests against its promotion of legitimate governmental interests (*Samson v. California*, *supra*, 547 U.S. at p. 848), we conclude the compulsory and warrantless collection of buccal swab DNA samples from all adult felony arrestees

22

for DNA testing and analysis, as authorized by the 2004 Amendment to the DNA Act, does not violate the Fourth Amendment to the federal Constitution.

1. *Intrusion on felony arrestees' privacy interests*

Nonconsensual extractions of biological samples that may be used for DNA profiling are "searches" entitled to the protection of the Fourth Amendment. (*Schmerber v. California* (1966) 384 U.S. 757, 767–771 (blood); *People v. Robinson, supra,* 47 Cal.4th at pp. 1119, 1121, cert. den. sub nom. *Robinson v. California* (2010) ___ U.S. ___ [131 S.Ct. 72] (blood); *Skinner v. Ry. Labor Executives' Ass'n* (1989) 489 U.S. 602, 616–617 (breathalyzer and urine sample); *Cupp v. Murphy* (1973) 412 U.S. 291, 295 (finger nail scrapings).) In *King*, the United States Supreme Court recently explained that "using a buccal swab on the inner tissues of a person's cheek in order to obtain DNA samples is a search" within the meaning of the Fourth Amendment. (*King*, *supra*, 133 S.Ct. at p. 1969.)

Felony arrestees have a "significantly diminished expectation of privacy." (*Harris*, *supra*, 669 F.3d at p. 1058; see also *King*, *supra*, 133 S.Ct. at p. 1978 ["The expectations of privacy of an individual taken into police custody 'necessarily [are] of a diminished scope.'"].) They are often booked and placed in a jail cell pending arraignment or bail, and they are typically subjected at that point to various degrading physical and emotional intrusions. For example, they may be subjected to visual body cavity searches (*Bell v. Wolfish* (1979) 441 U.S. 520, 558 & fn. 39 [upholding searches where male inmates "must lift [their] genitals and bend over to spread [their] buttocks for visual inspection" and "[t]he vaginal and anal cavities of female inmates also are visually

inspected"]); they may be monitored by guards while they shower and use the toilet (*Johnson v. Phelan* (7th Cir. 1995) 69 F.3d 144, 145); and they may have their telephone access restricted (*Valdez v. Rosenbaum* (9th Cir. 2002) 302 F.3d 1039, 1048-1049).

Here, we evaluate Lowe's claim that the buccal swab DNA search authorized by the 2004 Amendment is unreasonable against the fact that, as discussed, felony arrestees have diminished privacy rights.

a. *Physical intrusiveness*

We begin by noting that the typical modern DNA collection procedure─the buccal swab to which Lowe was subjected in this matter─is much less invasive than the blood test approved in *Schmerber v. California*, *supra*, 384 U.S. 757. The collection of a buccal swab DNA sample involves the brief insertion of a cotton swab into the person's mouth, whereas the typical blood extraction involves the insertion of a needle into a blood vessel. (*Harris*, *supra*, 669 F.3d at p. 1059.) "The procedure is quick and painless." (*King*, *supra*, 133 S.Ct. at p. 1968.) Thus, a buccal swab cannot seriously be viewed as an unacceptable physical intrusion. (See *King*, *supra*, 133 S.Ct. at p. 1977 ["[T]he intrusion of a cheek swab to obtain a DNA sample is a minimal one."]; *United States v. Amerson* (2d Cir. 2007) 483 F.3d 73, 84, fn. 11 ["If . . . the DNA were to be collected by cheek swab, there would be a lesser invasion of privacy [than a blood draw] because a cheek swab can be taken in seconds without any discomfort."].)

b. *Governmental use and retention of DNA information*

Lowe challenges as unconstitutionally intrusive the governmental use and retention of the information contained in the DNA sample that was taken from him

24

without a warrant while he was under arrest, as authorized by the 2004 Amendment. However, as already discussed, a DNA profile derived from a DNA sample taken from a felony arrestee under the amended DNA Act contains only 13 junk DNA markers that are not linked to any genetic or physical trait. They are used only to identify the individual. (See § 295.1, subd. (a), discussed, *ante*; *Kincade*, *supra*, 379 F.3d at p. 837 ["[T]he DNA profile derived from the defendant's [DNA] sample establishes only a record of the defendant's identity—otherwise personal information in which the qualified offender can claim no right of privacy once lawfully convicted of a qualifying offense (indeed, once lawfully arrested and booked into state custody)."]); *United States v. Amerson*, *supra*, 483 F.3d at p. 85 ["[A]t least in the current state of scientific knowledge, the DNA profile derived from the offender's blood sample establishes only a record of the offender's identity."].)

Given the minimal amount of genetic information currently contained in a DNA profile, we are persuaded that DNA collected, used, and retained under the amended DNA Act is substantially indistinguishable from traditional fingerprinting as a means of identifying arrestees and, incidentally, tying them to criminal investigations. As the *King* court recently observed, "[b]y the middle of the 20th century, it was considered 'elementary that a person in lawful custody may be required to submit to photographing and fingerprinting as part of routine identification processes.'" (*King*, *supra*, 133 S.Ct. at p. 1976.) Thus, "[p]erhaps the most direct historical analogue" to the buccal swab DNA technology "is the familiar practice of fingerprinting arrestees." (*Ibid*.) The *King* court

25

also observed that "the only difference between DNA analysis and the accepted use of fingerprint databases is the unparalleled accuracy DNA provides." (*Id*. at p. 1972.)

We acknowledge that DNA collected from felony arrestees is ~~more~~ susceptible to misuse. However, as already noted, the DNA act, as amended by the 2004 Amendment, carefully and sharply limits the range of permissible uses of the DNA information obtained and imposes significant criminal penalties upon those who violate those limitations. (See §§ 295.1; subd. (a); 299.5, subd. (f); 299.5, subd. (i).) Thus, we conclude that the collection, use, and retention of information from junk DNA markers as authorized by the amended DNA Act does not significantly intrude upon a felony arrestee's privacy.

2. *Promotion of legitimate governmental interests*

On the other side of the Fourth Amendment balance, we weigh four principal and legitimate governmental interests: identifying arrestees, solving past crimes, preventing and solving future crimes, and exonerating the innocent.

a. *Identification of arrestees*

The primary purpose of the amended DNA Act is to identify arrestees. (See § 295.1, subd. (a) ["The Department of Justice shall perform DNA analysis . . . pursuant to this chapter only for identification purposes."].) This longstanding governmental interest is legitimate. (*King*, *supra*, 133 S.Ct. at p. 1970 ["[T]he need for law enforcement officers in a safe and accurate way to process and identify the persons and possessions they must take into custody" is a "legitimate government interest."]; *Jones v. Murray* (4th Cir. 1992) 962 F.2d 302, 306 ["[W]hen a suspect is arrested upon probable

26

cause, his identification becomes a matter of legitimate state interest."]; see also *United States v. Kriesel* (9th Cir. 2007) 508 F.3d 941, 947 ["[T]racking . . . identity is the primary consequence of DNA collection."].)

b. *Solving past crimes*

By accurately identifying felony arrestees, the DNA database helps promote the legitimate and compelling governmental interest in solving past crimes. When California voters passed Proposition 69, enacting the 2004 Amendment to the DNA Act, they expressly recognized the critical importance of expanding the DNA data bank program to include collection and analysis of DNA samples from felony arrestees in order to promote the expeditious solving of crimes: "The people of the State of California do hereby find and declare that . . . [t]here is a critical and urgent need to provide law enforcement officers and agencies with the latest scientific technology available for accurately and expeditiously identifying, apprehending, arresting, and convicting criminal offenders . . . ." (Voter Information Guide, *supra*, text of Prop. 69, sec. II, subd. (b), p. 135.)

If a felony arrestee has committed crimes other than the crime he or she is currently suspected of committing, those past crimes must be prosecuted as soon as possible, while victims and witnesses can be located and before memories fade. In this respect the collection and carefully restricted use of identifying DNA information taken from felony arrestees promotes the legitimate governmental interest in the accurate and expeditious solving of past crimes.

In addition, "by contributing to the solution of past crimes, DNA profiling of qualified . . . offenders helps bring closure to countless victims of crime who long have languished in the knowledge that perpetrators remain at large." (*Kincade, supra,* 379 F.3d at p. 839.)

c. *Preventing and solving future crimes*

"'The government's interest in preventing crime by arrestees is both legitimate and compelling.'" (*King*, *supra*, 133 S.Ct. at p. 1973.)

Implementing the 2004 Amendment provides law enforcement agencies with a catalogue of arrestees' DNA, a tool that potentially will help solve and prevent future crimes. The mere existence of the DNA database creates a strong deterrent effect, and a felony arrestee from whom a DNA sample has been collected pursuant to the 2004 Amendment will be less likely to commit another crime in the future because he or she knows that the collected DNA is catalogued in the DNA database. (See, e.g., *Kincade*, *supra*, 379 F.3d at pp. 838-839 [mandatory DNA profiles of convicted felons "fosters society's enormous interest in reducing recidivism"]; *Jones v. Murray*, *supra*, 962 F.2d at p. 311 ["[T]he Commonwealth's interest in combatting and deterring felony recidivism justifies the involuntary taking of the sample and the creation of the DNA data bank as reasonable in the context of the Fourth Amendment."].)

d. *Exonerating the innocent*

Last, by helping identify the actual perpetrators of crimes, the DNA database allows law enforcement officers to eliminate innocent persons from suspect lists. (See *King*, *supra*, 133 S.Ct. at p. 1974 ["[I]n the interests of justice, the identification of an

arrestee as the perpetrator of some heinous crime may have the salutary effect of freeing a person wrongfully imprisoned for the same offense."]**;** *United States v. Sczubelek* (3d Cir. 2005) 402 F.3d 175, 185 ["[T]he DNA samples will help to exculpate individuals who are serving sentences of imprisonment for crimes they did not commit and will help to eliminate individuals from suspect lists when crimes occur."].) The privacy intrusion caused by a buccal swab of a felony arrestee must be viewed as minor compared to society's compelling goal of ensuring that innocent people are exonerated.

3. *Balancing and holding*

In *Harris*, *supra*, 669 F.3d at page 1058, the Ninth Circuit recently explained that "[t]he 2004 Amendment does not provide the Government carte blanche to take buccal swabs from anyone and everyone. It applies only to persons arrested on suspicion of having committed a felony. Before individuals can be required to give a buccal swab DNA sample under the 2004 Amendment, a law enforcement officer must determine that there is probable cause to suspect that person of having committed a felony." (Italics omitted.)

We conclude that the legitimate governmental interests promoted by the warrantless collection of buccal swab DNA samples from felony arrestees who are taken into custody upon probable cause, far outweigh the arrestees' privacy concerns. Our conclusion is based on the following five reasons: The felony arrestee's diminished privacy interests; the de minimis nature of the physical intrusion involved in the collection of a buccal swab DNA sample; the carefully limited scope of the DNA information that is extracted; the strict limits on the range of permissible uses of the DNA

29

information obtained and the significant criminal penalties imposed upon those who violate those limitations; and the strong law enforcement interests in obtaining arrestees' identifying information, solving past and future crimes, deterring future criminal acts, and exonerating the innocent.

Accordingly, we hold that the 2004 Amendment authorizing the mandatory and warrantless collection and analysis of buccal swab DNA samples from felony arrestees does not violate the Fourth Amendment.  Thus, we also conclude the court properly denied Lowe's suppression motion.

a. *King*

Our decision is consistent with the United States Supreme Court's recent majority decision in *King*, which upheld the constitutionality of the Maryland DNA Collection Act (Maryland Act) that authorizes Maryland law enforcement authorities to collect and analyze buccal swab DNA samples from persons arrested and charged with qualifying "serious" offenses.[7]  (*King*, *supra*, 133 S.Ct. at pp. 1965-1966, 1967, 1980.)  *King*

---

[7]     The *King* majority explained that the Maryland Act "authorizes Maryland law enforcement authorities to collect DNA samples from 'an individual who is charged with . . . a crime of violence or an attempt to commit a crime of violence; or . . . burglary or an attempt to commit burglary.'  Md. Pub. Saf. Code Ann. § 2–504(a)(3)(i) (Lexis 2011).  Maryland law defines a crime of violence to include murder, rape, first-degree assault, kidnaping, arson, sexual assault, and a variety of other serious crimes.  Md. Crim. Law Code Ann. § 14–101 (Lexis 2012).  Once taken, a DNA sample may not be processed or placed in a database before the individual is arraigned (unless the individual consents).  Md. Pub. Saf. Code Ann. § 2–504(d)(1) (Lexis 2011).  It is at this point that a judicial officer ensures that there is probable cause to detain the arrestee on a qualifying serious offense.  If 'all qualifying criminal charges are determined to be unsupported by probable cause . . . the DNA sample shall be immediately destroyed.  § 2–504(d)(2)(i).  DNA samples are also destroyed if 'a criminal action begun against the

30

concluded that "*DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure*.  When officers make an arrest supported by probable cause to hold for a serious offense and they bring the suspect to the station to be detained in custody, taking and analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment."  (*Id*. at p. 1980, italics added.)

In reaching this decision, the majority in *King* explained that the Maryland Act served legitimate and substantial governmental interests such as accurately identifying and processing the persons and property law enforcement officers must take into custody (*King*, *supra,* 133 S.Ct. at p. 1970), solving crimes (*id*. at pp. 1971-1972), and exonerating the innocent (*id*. at p. 1974).  Against the governmental interests served by the Maryland Act the *King* majority weighed the "minimal" intrusion of a cheek swab to obtain a DNA sample from the arrestee.  (*Id*. at pp. 1974, 1977-1978.)  Noting that "a detainee has a reduced expectation of privacy," the *King* majority explained that, "[i]n light of statutory protections that guard against further invasion of privacy,"[8] the analysis

---

individual . . . does not result in a conviction,' 'the conviction is finally reversed or vacated and no new trial is permitted,' or 'the individual is granted an unconditional pardon.  § 2–511(a)(1)."  (*King*, *supra*, 133 S.Ct. at p. 1967.)

[8]     The *King* majority stated that the Maryland Act "requires that '[o]nly DNA records that directly relate to the identification of individuals shall be collected and stored.'  Md. Pub. Saf. Code Ann . § 2–505(b)(1).  No purpose other than identification is permissible: 'A person may not willfully test a DNA sample for information that does not relate to the identification of individuals as specified in this subtitle.'  § 2–512(c).  This Court has noted often that 'a "statutory or regulatory duty to avoid unwarranted disclosures" generally allays . . . privacy concerns.'"  (*King*, *supra*, 133 S.Ct. at p. 1979-1980.)

of the DNA sample "did not amount to a significant invasion of privacy that would render the DNA identification impermissible under the Fourth Amendment." (*Id*. at pp. 1978, 1980.)

*King* is not limited to the particular provisions of the Maryland Act. Citing an amicus curiae brief submitted by the State of California, the *King* majority observed that "[28] States and the Federal Government have adopted laws similar to the Maryland Act authorizing the collection of DNA from some or all arrestees. . . . Although those statutes vary in their *particulars*, such as what charges require a DNA sample, their similarity means that *this case implicates more than the specific Maryland law*. At issue is a standard, expanding technology already in widespread use throughout the Nation." (*King*, *supra*, 133 S.Ct. at p. 1968, italics added.)

Although the "particulars" of the Reform Act and the Maryland Act—such as the qualifying offenses that require the collection of buccal swab DNA samples from arrestees, and the procedures for destroying DNA samples and expunging DNA database profiles—differ, those differences do not render our decision inconsistent with the majority's decision in *King*. Here, as in *King*, the minimal intrusion of the buccal swab into the arrestee's diminished right to privacy is outweighed by the important governmental interests served by the challenged statute. Here, as in *King*, scientific and statutory safeguards (discussed, *ante*) are provided by the Reform Act such that the analysis of the collected DNA sample "d[oes] not amount to a significant invasion of privacy that would render the DNA identification impermissible under the Fourth Amendment." (*King*, *supra*, 133 S.Ct. at p. 1980.)

32

## II

### SECTION 654 (COUNTS 3, 7, & 11)

Lowe also contends the sentences imposed for his two first degree burglary convictions (counts 3 and 7) and for his conviction of kidnapping Amanda for rape or robbery (count 11) must be stayed under section 654 because the sentences "constitute improper multiple punishment."  We conclude the judgment must be modified to stay under section 654 the execution of the prison sentence of one year four months the court imposed for Lowe's count 3 conviction of first degree burglary.  As modified, the judgment is affirmed.

A.  *Section 654*

Section 654, subdivision (a) provides in part:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

Section 654 "precludes multiple punishment for a single act or omission, or an indivisible course of conduct" (*People v. Deloza* (1998) 18 Cal.4th 585, 591) and ensures the defendant's punishment will be commensurate with his or her criminal culpability (*People v. Kramer* (2002) 29 Cal.4th 720, 723).  If a defendant suffers two convictions and punishment for one is barred by section 654, that section requires that the sentence for one conviction be imposed and the other be *imposed and then stayed*.  (*People v. Deloza*, at pp. 591-592.)

33

Whether a course of conduct is indivisible for purposes of section 654 depends on the intent and objective of the defendant, not the temporal proximity of the offenses. (*People v. Hicks* (1993) 6 Cal.4th 784, 789.)  Generally, if all the criminal acts were incident to one objective, then punishment may be imposed only as to one of the offenses committed.  (*People v. Rodriguez* (2009) 47 Cal.4th 501, 507; *People v. Garcia* (1995) 32 Cal.App.4th 1756, 1781.)  The question of whether a defendant harbored multiple criminal objectives is a question of fact for the trial court to decide.  (*People v. Coleman* (1989) 48 Cal.3d 112, 162.)   A trial court's determination that a defendant held multiple criminal objectives will be upheld on appeal if it is supported by substantial evidence. (*People v. Osband* (1996) 13 Cal.4th 622, 730-731.)

    1.  *Multiple victim exception*

However, under the "multiple victim" exception to section 654, the limitations of this section do not apply to crimes of violence against multiple victims.  (*People v. Oates* (2004) 32 Cal.4th 1048, 1063; *People v. Garcia*, *supra*, 32 Cal.App.4th at p. 1781; *People v. Deloza*, *supra*, 18 Cal.4th at p. 592 ["Section 654 does not . . . preclude multiple punishment when the defendant's violent act injures different victims."].)  Under this exception, a defendant may be convicted and punished for each crime of violence committed against a different victim "even though a defendant entertains but a single principal objective during an indivisible course of conduct."  (*People v. Ramos* (1982) 30 Cal.3d 553, 587, revd. on other grounds in *California v. Ramos* (1983) 463 U.S. 992; see also *People v. Garcia*, *supra*, 32 Cal.App.4th at p. 1781.)  "The multiple victim exception, simply stated, permits one unstayed sentence per victim of all the violent

crimes the defendant commits incidental to a single criminal intent."  (*People v. Garcia*, *supra*, at p. 1784.)  Thus, section 654 does not apply where one act has two results each of which is an act of violence against the person of a separate individual.  (*People v. Oates*, *supra*, 32 Cal.4th at p. 1063.)

The multiple victim exception to section 654 is based on the rationale that "when a defendant '"commits an act of violence with the intent to harm more than one person or by means likely to cause harm to several persons," his greater culpability precludes application of section 654.'"  (*People v. McFarland* (1989) 47 Cal.3d 798, 803; see also *People v. Centers* (1999) 73 Cal.App.4th 84, 99; *People v. Garcia*, *supra*, 32 Cal.App.4th at p. 1781.)

"[W]hether a crime constitutes an act of violence that qualifies for the multiple-victim exception to section 654 depends upon whether the crime (in conjunction with any allegations in enhancement) is defined to proscribe an act of violence against the person."  (*People v. Hall* (2000) 83 Cal.App.4th 1084, 1092.)  The mere potential for violence is insufficient to qualify a crime as violent for purposes of the multiple-victim exception to section 654.  (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1024-1025, citing *People v. Hall*, *supra*, at pp. 1091-1094.)

C.  *Analysis*

1.  *Count 3*

Lowe first contends the prison sentence of one year four months the court imposed for his count 3 conviction of first degree burglary must be stayed under section 654.  We conclude the court erred by not staying that sentence under section 654.

35

When a defendant commits both burglary and the underlying intended felony against a single victim, section 654 generally permits punishment for one of the crimes, but not for both, because the burglary is merely incident to, and a means of perpetrating, the intended felony. (See *People v. James* (1977) 19 Cal.3d 99, 119-120 [burglary and intended robbery]; see also *People v. Centers*, *supra*, 73 Cal.App.4th at p. 99.)

Here, Lowe was accused in count 3 of unlawfully entering an inhabited dwelling house on March 24, 2004, "with intent to commit theft and a felony." The evidence established that this house was inhabited by Jennifer, one of the victims in this case. The jury found Lowe guilty of count 3 and three other felony counts he committed against Jennifer in her home on that date: robbery (count 4); forcible oral copulation (count 5); and rape (count 6).

Jennifer was the sole victim of these four crimes. The court punished Lowe for these offenses by sentencing him to prison terms of one year four months for the count 3 first degree burglary, one year four months for the count 4 robbery, 25 years to life for the count 5 forcible oral copulation, and 25 years to life for the count 6 rape. As punishment for all 13 of Lowe's convictions and the related true findings in this matter, the court imposed a determinate term of 15 years eight months plus a consecutive indeterminate prison term of 107 years to life.

Regardless of which of the offenses charged in counts 4 through 6 Lowe intended to commit when he unlawfully entered Jennifer's home, section 654 precluded separate punishment for his count 3 burglary conviction because the court imposed punishment for

36

the underlying intended crime or crimes. (See *People v. James*, *supra*, 19 Cal.3d at pp. 119-120; *People v. Centers*, *supra*, 73 Cal.App.4th at p. 99.)

The Attorney General disagrees, claiming that Lowe "entertained separated intents and objectives" in committing the four offenses charged in counts 3 through 6 and, thus, the court properly imposed separate sentences for each count. In support of this claim, the Attorney General maintains that substantial evidence supports the court's "implied finding" that Lowe entered Jennifer's home with the intent to commit a sex crime against Victoria, the woman he was convicted of attempting to rape (as charged in count 2) in that same house four months earlier. However, the Attorney General asserts, when Lowe found Jennifer, *not Victoria*, in the home, "he formed the intent to rob, rape and force [Jennifer] to orally copulate him."

In essence, the Attorney General claims the court properly imposed separate sentences for each of the four crimes charged in counts 3 through 6—including the burglary—because, although Lowe did commit burglary by entering Jennifer's home with the intent to commit a robbery and a sex crime, he acted with a separate intent and objective in that Jennifer was not the victim he intended to rob and sexually assault when he unlawfully entered her home; that is, he intended to commit the crimes against Victoria. This claim is unavailing. In committing the robbery and sex offenses charged in counts 4 through 6, Lowe acted with the same intent—the intent to commit robbery and a sex crime—he harbored when he unlawfully entered Jennifer's home and, thus, the section 654 prohibition of multiple punishment applies. The identity of the actual victim is immaterial, and the Attorney General has cited no authority (and we are aware of none)

37

in support of the claim that it is relevant. Section 654 ensures the defendant's punishment will be commensurate with his or her criminal culpability. (*People v. Kramer*, *supra*, 29 Cal.4th at p. 723.) The Attorney General does not explain in what respect Lowe's criminal behavior is more culpable, such that he should suffer an additional consecutive punishment for the count 3 burglary, merely because his victim was Jennifer rather than Victoria. Accordingly, we conclude the judgment must be modified to stay under section 654 the sentence of one year four months imposed for Lowe's count 3 burglary conviction.

2. *Count 7*

We reject Lowe's next contention that the execution of the sentence of one year four months the court imposed for the count 7 burglary conviction also must be stayed under section 654. Lowe was charged in that count with unlawfully entering an inhabited dwelling house on October 3, 2006, "with intent to commit theft and a felony." The evidence established that this house was inhabited by Grosso, Grosso's daughter, and Grosso's granddaughter, three of the victims in this case. The jury found Lowe guilty of count 7 and three other crimes he was accused of committing there on that date: robbery of Grosso's friend, Whitton (count 8); attempted robbery of Grosso (count 9); and misdemeanor annoyance of Whitton's granddaughter (count 3).

We conclude section 654 does not require that the execution of the consecutive sentence imposed for Lowe's count 7 burglary conviction be stayed because (1) as discussed, the limitations of this section do not apply to crimes of violence against multiple victims, even if all the violent crimes were incidental to a single criminal intent

38

(*People v. Oates*, *supra*, 32 Cal.4th at p. 1063; *People v. Garcia*, *supra*, 32 Cal.App.4th at pp. 1781, 1784); and (2) here, the multiple victim exception to section 654 applies because the robbery, the attempted robbery, and the burglary were crimes of violence against different victims.

Specifically, robbery and attempted robbery are crimes of violence for purposes of the multiple victim exception. (*People v. Deloza*, *supra*, 18 Cal.4th at p. 592.) Here, Lowe was convicted of robbing Whitton as charged in count 8 and attempting to rob a different victim, Grosso, as charged in count 9. Thus, counts 8 and 9 were crimes of violence for purposes of the multiple victim exception.

The third felony─burglary (count 7)─that Lowe was convicted of committing during the incident at the residence where Grosso and her daughter and granddaughter resided and were present during the incident, was also a crime of violence for purposes of the multiple victim exception. Ordinarily, burglary is not a violent crime for purposes of that exception. (*People v. Centers*, *supra*, 73 Cal.App.4th at p. 99.) However, it may be treated as such when there is a finding the defendant either inflicted great bodily injury or used a weapon in the commission of the burglary. (*Ibid.*) "Use" of a weapon includes "conduct which produces a fear of harm or force by means or display" of the weapon. (*People v. Masbruch* (1996) 13 Cal.4th 1001, 1007; *People v. Centers*, *supra*, 73 Cal.App.4th at p. 99.) Here, substantial evidence supports the implied finding that Lowe caused his victims to fear harm by brandishing a knife after holding it to Whitton's granddaughter's neck when he unlawfully entered the home.

For the foregoing reasons, we conclude that section 654 does not preclude punishment for Lowe's count 7 burglary conviction because the felonies he committed (counts 7 through 9) were crimes of violence against different victims; and, thus, the multiple victim exception to section 654 applies. Accordingly, we affirm the sentence the court imposed for Lowe's count 7 conviction.

3. *Count 11*

Last, we reject Lowe's contention that the execution of the sentence the court imposed for his count 11 conviction also must be stayed under section 654.

a. *Background*

As shown by the count 11 verdict form, Lowe was charged in that count with kidnapping Amanda "for [r]ape *or* [r]obbery" (italics added). Lowe also was charged with committing two other crimes against Amanda: robbery (count 12) and forced oral copulation (count 13).

The jury found Lowe guilty of all three counts. In addition, as to counts 11 and 12, the jury found true allegations that Lowe personally used a deadly or dangerous weapon (a knife) within the meaning of section 12022, subdivision (b). With regard to count 13, the jury also found true allegations that Lowe was armed with a deadly weapon (a knife) within the meaning of section 12022.3, subdivision (b); he kidnapped Amanda and his movement of her increased the risk of harm within the meaning of section 667.61, subdivisions (d)(2), (e)(1); and he personally used a dangerous or deadly weapon (a knife) within the meaning of section 667.61, subdivision (e)(4). As punishment for

40

Lowe's count 11 conviction, the court imposed a sentence of seven years to life, plus an additional one-year enhancement for the use of the knife.

b. *Analysis*

As the Attorney General acknowledges, Lowe correctly cites *People v. Lewis* (2008) 43 Cal.4th 415, 519 (*Lewis*), for the proposition that section 654 prohibits punishment for both kidnapping to commit robbery and the robbery of the victim of the kidnapping.

Relying on *Lewis* as support for his claim that execution of his count 11 sentence (including the enhancement for the use of the knife) must be stayed under section 654, Lowe contends the record fails to support a finding that his objective in kidnapping Amanda on October 3, 2006, was anything "other than the robbery and forced oral copulation" for which he was convicted and punished in counts 12 and 13.

We reject this contention because substantial evidence supports the court's implied determination in imposing Lowe's count 11 sentence that he kidnapped Amanda with the objective and intent to rape her in the UCR bathroom stall, but thereafter changed his mind and, instead, forced her to orally copulate him there. Specifically, as detailed more fully, *ante*, substantial evidence supports both his conviction of attempting to rape Victoria in November 2003 as charged in count 2 and his conviction for raping Jennifer in March 2004 about four months later as charged in count 6. With respect to the crimes he committed against Amanda as charged in counts 11 through 13, substantial evidence shows that, after he threatened her with a knife and dragged her into the UCR women's

41

bathroom stall, Lowe told her he wanted to have sex with her. When Amanda said, "No," Lowe forced her to orally copulate him.

Lowe's reliance on *People v. Lewis*, *supra*, 43 Cal.4th 415, is unavailing because, here, the court did not impose double punishment in violation of section 654. Rather, the record shows the court properly imposed separate punishments for his criminal acts of (1) kidnapping Amanda with intent to rape her, (2) robbing her, and (3) forcing her to orally copulate him. Accordingly, we affirm the sentence imposed for Lowe's count 11 conviction and the related enhancement.

### DISPOSITION

The judgment is modified to stay under Penal Code section 654 the execution of the prison sentence of one year four months the court imposed for Lowe's count 3 conviction of first degree burglary. As modified, the judgment is affirmed. The trial court is directed to amend the abstract of judgment to reflect this modification of the judgment and to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.

NARES, J.

WE CONCUR:

HUFFMAN, Acting P. J.

HALLER, J.

42

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D059007 |
| Plaintiff and Respondent, | (Super. Ct. No. RIF132717) |
| v. | ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR |
| JUSTIN SAMUEL LOWE, | PARTIAL PUBLICATION |
| Defendant and Appellant. | NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on November 15, 2013, be modified as follows:

1. On page 5, first line, footnote 2 is deleted in its entirety.

2. On page 26, first sentence of the first full paragraph, the word with a strikethrough, "~~more~~," is deleted.

3. On page 32, second full paragraph, the two references to "Reform Act" are deleted and replaced with "2004 Amendment," so the paragraph reads:

> Although the "particulars" of the 2004 Amendment and the Maryland Act—such as the qualifying offenses that require the collection of buccal swab DNA samples from arrestees, and the

---

[*] Pursuant to California Rules of Court, rule 8.1110(b), this opinion is certified for publication with the exception of part II.

procedures for destroying DNA samples and expunging DNA
database profiles—differ, those differences do not render our
decision inconsistent with the majority's decision in *King*. Here, as
in *King*, the minimal intrusion of the buccal swab into the arrestee's
diminished right to privacy is outweighed by the important
governmental interests served by the challenged statute. Here, as in
*King*, scientific and statutory safeguards (discussed, *ante*) are
provided by the 2004 Amendment such that the analysis of the
collected DNA sample "d[oes] not amount to a significant invasion
of privacy that would render the DNA identification impermissible
under the Fourth Amendment." (*King*, *supra*, 133 S.Ct. at p. 1980.)

There is no change in the judgment.

The opinion in the above-entitled matter filed on November 15, 2013, was not

certified for publication in the Official Reports. For good cause it now appears that the

opinion should be published with the exception of part II, pursuant to California Rules of

Court, rule 8.1110(b), and it is so ordered.


NARES, Acting P. J.

Copies to:  All parties


2